83 A.3d 137

COMMONWEALTH of Pennsylvania, Appellee,

v.

Harold MURRAY, IV, Appellant.

Supreme Court of Pennsylvania.

Argued May 7, 2013.

Decided Dec. 27, 2013.

508

510

512

Michael Wiseman, Esq., Philadelphia, for Harold Murray IV.

Robert Martin Falin, Esq., Montgomery County District Attorney's Office, Amy Zapp, Esq., Harrisburg, PA Office of Attorney General, Kevin R. Steele, Esq., Norristown, for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## *OPINION*

Justice BAER.

Appellant, Harold Murray, IV, appeals from an order of the Montgomery County Court of Common Pleas, which imposed a judgment of sentence of death following his conviction of, *inter alia*, three counts of first degree murder. For the reasons that follow, we affirm the convictions in this regard, but vacate the imposition of the sentence of death, and remand for a new penalty hearing.

## I. Factual and Procedural Backgrounds

During the early morning hours of January 30, 2005, Shawne Mims, Vernon Brewer, and other individuals were smoking crack cocaine. At some point during those early morning hours, Mims, Brewer, and Kristen Holmes decided to buy more cocaine, and therefore sought to contact someone at 110 Chain Street in Norristown, Montgomery County, which was a known drug house. A woman, known as Jennifer Gray and by her real name, Jennifer Pennington, answered the phone, and told the trio that she would attempt to procure more crack cocaine for them.

Immediately afterward, Mims, Brewer, and Holmes drove to 110 Chain Street, and Holmes went inside to speak with Pennington. Pennington had been unable to obtain any crack cocaine, and Holmes returned to the car. The three left the house, but then parked a few houses away in anticipation of Pennington calling with information regarding the drugs. Several minutes later, Pennington came outside, directed them to drive to the residence of Jackie Clemens, and went with them.

When they arrived at Clemens' house, the two women remained in the car while Brewer and Mims went inside, where they found Appellant and Ernest Morris. Brewer and Mims proceeded to rob Appellant and Morris at gunpoint, stealing money, drugs, and cell phones. After completing the robbery, the four who had driven together to Clemens' house went to a Motel 6 in King of Prussia, where they smoked crack cocaine, drank tequila, and had sex with each other. Brewer, Mims, and Pennington later left Holmes at the Motel 6, and went to a nearby Best Western hotel, where they continued to ingest more narcotics. While at the Best Western, Pennington began using the cell phones Brewer and Mims had stolen from Appellant and Morris. Brewer would later testify that, during one of Pennington's conversations on one of the stolen phones, she said "Oh, my God, they're going to kill me. They're going to kill me." Notes of Testimony (N.T.), Apr. 15, 2009 at 153.

Later in the evening of January 30, Appellant, Morris, and a third man, Maurice Jones, began searching for Mims, Brewer, and Pennington. Apparently, during the robbery, Appellant had recognized Mims, and had come to believe that Pennington was also involved. At approximately 11:30 p.m. on January 30, the three men broke into the home of Mims' girlfriend, Malaika Bolen, armed with guns: Appellant with an AK–47 rifle; Morris with a .357 revolver; and Jones with a 9 mm semi-automatic handgun. They demanded to know Morris' whereabouts, and, when they were unsuccessful, they forced Bolen and three children into a basement and barricaded the door shut.

Eventually, and after inquiring to several acquaintances concerning the whereabouts of Mims and Pennington, Appellant and his cohorts learned that Pennington was at a Wawa convenience store in King of Prussia. Between 2:00 and 2:30 a.m. (now January 31, 2005), they arrived at the store, saw Pennington inside, and forced her into their vehicle. Surveillance video from inside of the store revealed Pennington present during that time, and clearly pregnant. From Pennington, the men learned that Mims was located in Room 123 of the aforementioned Best Western hotel, and they all went to the hotel and parked outside of Room 123.

Appellant and Morris decided to go into the room, while Jones stayed in the car to guard Pennington. At 3:20 a.m., using an electronic keycard forcibly taken by Appellant from Pennington, Appellant and Morris entered the room, each shot a naked and unarmed Mims once in the back with the AK–47 and .357 revolver, respectively, and fled the scene with Pennington still in the car. Mims died in the hotel room, the bullets having caused catastrophic damage to several major organs.

The three men then drove Pennington to Fairmount Park in Philadelphia. They forced Pennington from the car and Morris shot her twice in the face with the .357 revolver. Pennington died from her wounds, and her unborn baby did not survive. Appellant and his conspirators then returned to the

Best Western to search for their stolen items, and eventually fled to Appellant's apartment in Philadelphia.

At approximately 4:19 a.m., Philadelphia Police responded to a report of a body in Fairmount Park. By 4:30 a.m., the police had arrived at Fairmount Park and detectives discovered the body of Jennifer Pennington. A search of her body revealed a receipt for the Best Western hotel, Room 123, in the name of Shawne Mims. Philadelphia homicide detectives and Montgomery County District Attorney detectives went to the hotel, entered the room with a key given to them by the hotel manager, and discovered Mims' body.

After a lengthy investigation involving both Montgomery County and Philadelphia detectives, the Commonwealth filed a criminal complaint against Appellant on March 24, 2005, charging him with three counts of first degree murder in the deaths of Mims, Pennington, and Pennington's unborn child, as well as various other offenses related to the murders and home invasion of the Bolen residence. On May 27, 2005, Philadelphia and Montgomery County authorities learned that Appellant was residing in an apartment in Philadelphia. The task force entered the building and arrested Appellant who, immediately upon being taken into custody, stated to the arresting officers, "I'm tired of running. Let's get this over with and I'll be out in two years." N.T., Apr. 23, 2009 at 172–73.[1] Following a preliminary hearing, the Commonwealth filed a notice of intent to seek the death penalty.

While Appellant was in prison, he implicated himself in the murders in conversations with an acquaintance and fellow inmate, Eric Sadler. According to Sadler, who would eventually testify before an investigating grand jury, Appellant indicated that, following being robbed, he felt belittled and disrespected, and thus began the hunt for those whom he felt responsible for the robbery: Mims and Pennington. He related to Sadler how, during the twenty-four hours following the robbery, he invaded the Bolen residence, inquired from

---

1. Appellant was the last of the three to be captured. Jones was arrested a few weeks after the murders, and Georgia authorities apprehended Morris in early May, 2005 after he had fled there.

other acquaintances if they knew the whereabouts of Mims and Pennington, and eventually discovered Pennington at the King of Prussia Wawa store during the early morning hours of January 31. Appellant further told Sadler that he gave Pennington drugs and went to the Best Western. He said that, upon arriving there, and while Jones guarded Pennington in the car, he "showed" Mims.

A joint trial for all three defendants—Appellant, Morris, and Jones—was scheduled to begin in January of 2006. In the course thereof, on September 13, 2005, Attorney Daniel-Paul Alva entered his appearance on Appellant's behalf. Prior to the beginning of trial, Attorney Alva indicated to the trial court that, for personal reasons, he had no inclination to continue to satisfy the educational requirements of Pa. R.Crim.P. 801, regarding the qualification of capital trial counsel.[2] The context and exact content of the dialogue between

---

**2.** Currently, Rule 801, entitled "Qualifications for Defense Counsel in Capital Cases," provides in relevant part as follows:

In all cases in which the district attorney has filed a Notice of Aggravating Circumstances pursuant to Rule 802, before an attorney may participate in any stage of the case either as retained or appointed counsel, the attorney must meet the educational and experiential criteria set forth in this rule.

**(1) Experience:** Counsel shall

(a) be a member in good standing of the Bar of this Commonwealth;

(b) be an active trial practitioner with a minimum of 5 years criminal litigation experience; and

(c) have served as lead or co-counsel in a minimum of 8 significant cases that were given to the jury for deliberations. If representation is to be only in an appellate court, prior appellate or post-conviction representation in a minimum of 8 significant cases shall satisfy this requirement. A "significant case" for purposes of this rule is one that charges murder, manslaughter, vehicular homicide, or a felony for which the maximum penalty is 10 or more years.

**(2) Education:**

(a) During the 3–year period immediately preceding the appointment or entry of appearance, counsel shall have completed a minimum of 18 hours of training relevant to representation in capital cases, as approved by the Pennsylvania Continuing Legal Education Board.

\* \* \*

Pa.R.Crim.P. 801(a).

The comment to Rule 801 specifies that the rule serves to provide for minimum competency standards statewide for capital counsel, and that

the trial court and Attorney Alva are not of record, but unquestionably led to the trial court removing Attorney Alva as lead counsel and appointing new counsel for Appellant.

Trial subsequently commenced on January 12, 2006, but the court declared a mistrial after opening statements. Appellant and his co-defendants attempted to bar re-trial on double jeopardy grounds and, interestingly, Attorney Alva took the lead in representing Appellant in that process. Subsequently, the trial court denied the motion, the Superior Court affirmed in January of 2008, and this Court denied discretionary review in September of 2008.

Accordingly, the trial court scheduled the second trial to begin on March 30, 2009; this trial, however, would be for

counsel must satisfy the requirements in order to be eligible at all stages of the case, "including pretrial, trial, post-conviction, and appellate." *Id.;* comment. Further, "the educational and experience requirements of the rule may not be waived by the trial or appellate court." *Id.,* comment.

Of further relevance to this appeal, Rule 801 currently mandates that capital counsel must possess, "during the 3–year period immediately preceding the appointment or entry of appearance," eighteen hours of Continuing Legal Education (CLE) credits relevant to representation in capital cases. Only recently, however, has the CLE requirement been eighteen hours. By order of June 4, 2004, this Court, effective November 1, 2004, began a phase-in of an increased requirement of CLE credits, as follows:

(1) from the date of this Order until the November 1, 2004 effective date, the appointing or admitting court shall determine that the attorney has attended at least 6 hours of courses relevant to representation in capital cases, using the new Rule 801 educational criteria as a guide for relevance;

(2) by November 1, 2004, to be eligible for appointment or to enter an appearance pursuant to new Rule 801, an attorney shall have completed a minimum of 6 hours of training relevant to representation in capital cases, as approved by the Continuing Legal Education Board;

(3) by November 1, 2005, to be eligible for appointment or to enter an appearance pursuant to new Rule 801, an attorney shall have completed a minimum of 12 hours of training relevant to representation in capital cases, as approved by the Continuing Legal Education Board; and

(4) by May 1, 2006, to be eligible for appointment or to enter an appearance pursuant to new Rule 801, an attorney shall have completed a minimum of 18 hours of training relevant to representation in capital cases, as approved by the Continuing Legal Education Board.

Appellant alone, as his co-defendants' appeals regarding their double jeopardy challenges were still proceeding.[3] Despite his earlier replacement, Appellant sought to have Attorney Alva, who was regarded as one of the most experienced homicide attorneys in the Commonwealth, again represent him as lead guilt phase counsel. The trial court accordingly held a pre-trial, evidentiary hearing on March 3, 2009, in order to determine Attorney Alva's compliance with Rule 801 and his concomitant eligibility to represent Appellant as lead guilt phase counsel. At the hearing, the court first noted that Attorney Alva's entry of appearance on September 13, 2005, remained valid, and supported his status as continuing counsel in the case. Accordingly, in the view of the trial court, at the time of his appearance Attorney Alva needed only six hours of CLE capital qualification credits in order to be eligible to represent Appellant. With that, the court directed Attorney Alva to testify regarding his compliance (or lack thereof) with Rule 801.

At the commencement of his testimony, Attorney Alva averred to the court that he was currently not in compliance with the eighteen-hour educational standard set forth in the current rule. *See* N.T., Mar. 3, 2009 at 12. He then asserted, however, that at the time of this Court's June 4, 2004, order phasing-in the increased educational requirements for capital counsel, he "was one of the instructors who gave the courses on qualifying to try death penalty cases." *Id.* Accordingly, not only did he have enough hours at the time of his entry of appearance, he "received double credits for actually being a presenter and having materials." *Id.* Attorney Alva stated that he stopped taking capital case CLE courses because he no longer wanted to make closing arguments in the penalty phase of capital trials, and acknowledged during the March 3 hearing that he had misunderstood the Rule 801 compliance

3. Eventually, Jones would plead guilty to third degree murder and receive a sentence of twenty to forty years of imprisonment. After Appellant's second trial, Morris stood trial in Montgomery County, and a jury convicted him of first degree murder in all three deaths. He received three consecutive life sentences without parole after the jury deadlocked concerning the death penalty.

requirement to apply only to attorneys participating as lead counsel in penalty phases. *Id.* at 13–15. Attorney Alva then noted,

ATTORNEY ALVA: Well, Judge, clearly my entry of appearance was entered 9–13[–]2005. And I state to within a three-year period before that, I had the requisite 18 hours. I have not kept them up since. I don't have an hour since we first tried this case. That I will state.

THE COURT: You're saying you had 18 hours during the three-year period prior to your entry of appearance? You had 18 hours? You had six at the time, because that's why you thought you could stay in the case, because that was all that was required then was six.

ATTORNEY ALVA: Judge, I have misstated. I cannot aver as an officer of the Court that I had a full 18. I would have to check that.

*Id.* at 29–30. The court then ended the hearing by indicating its belief that Appellant could not waive the Rule 801 requirements in order to retain Attorney Alva as lead guilt phase counsel, even if Appellant wanted only Attorney Alva to represent him.

When proceedings reconvened on March 30 for several pretrial matters, the trial court began by ruling from the bench regarding Attorney Alva's eligibility to serve as guilt phase counsel. In the court's view, "and following in depth research, and exhaustive research and consultation with our criminal administrative judge here," N.T., Mar. 30, 2009 at 4, Attorney Alva was qualified to serve as guilt phase counsel under the phase-in provisions of Rule 801 because, at least three years prior to having entered his appearance, Attorney Alva possessed six capital case CLE credits. The court then conducted a colloquy of Appellant, who re-affirmed his adamant position that he desired Attorney Alva to represent him.

The case proceeded to trial, during which the Commonwealth presented the testimony of Vernon Brewer who, as referenced above, had been with Shawne Mims, Kristen Holmes, and Jennifer Pennington during the night of January

30, 2005. Brewer testified that, following the robbery of Appellant and Morris, the four of them went to the Motel 6 in King of Prussia. Brewer stated that, during their time at the Motel 6, Pennington began using the mobile phones that he and Mims had stolen from Appellant and Morris during the robbery. At one point, someone "called the cell phone and Jen answered and they told her not to come back to Norristown. And she started spazzing out, 'Oh, my God, they're going to kill me. They're going to kill me.'" N.T., Apr. 15, 2009 at 153. Attorney Alva objected at sidebar that the statement was impermissible hearsay, but the trial court overruled on the grounds that it constituted an excited utterance.

The Commonwealth further elicited the testimony of various crime scene experts, who testified that Mims was shot with bullets consistent with both an AK–47 assault rifle and a .357 revolver; and Pennington was killed with a .357 revolver. To support this testimony, the Commonwealth sought to introduce three photographs of the deceased Jennifer Pennington, specifically the location of entrance and exit wounds in her face and head, to depict for the jury evidence of the specific intent to kill her. Over Appellant's objection, the court permitted the publication of these photographs to the jury, but for less than thirty seconds each, as relevant evidence depicting Appellant's specific intent to kill. See N.T., Apr. 17, 2009 at 61–68.

Afterwards, the Commonwealth called Eric Sadler, the aforementioned acquaintance of Appellant who had testified before a grand jury to what Appellant had told him occurred during the events of January 30 and 31, 2005. Sadler and Appellant first became acquainted some years prior, when Appellant and Sadler's brother were incarcerated at the same time. However, when the relevant conversation occurred, Appellant and Sadler were incarcerated together. At the commencement of his trial testimony, the following exchange between the Commonwealth's attorney and Sadler occurred:

THE COMMONWEALTH: Okay. I want to ask you if you know some people. I want to ask you if you know the defendant, Mr. Murray?

SADLER: Yes.

THE COMMONWEALTH: Is he a friend of yours?

SADLER: Yes.

THE COMMONWEALTH: Do you know him by any nicknames?

SADLER: Rafiq.

THE COMMONWEALTH: Any others?

SADLER: No.

THE COMMONWEALTH: When did you first meet Mr. Murray?

SADLER: I first met him when I came home [from prison]. I heard a lot about him through my brother, Omar.

\* \* \*

THE COMMONWEALTH: And how long after you got out of jail did you first meet Mr. Murray?

SADLER: Almost immediately.

THE COMMONWEALTH: Did you meet him—who did you meet him through?

SADLER: Omar. They was incarcerated together, so we— they did some time together. Him and I met because I heard a lot about him and we, you know, hooked up like that.

N.T., Apr. 21, 2009 at 144–45. At this point, Appellant moved for a mistrial due to Sadler's indication that Appellant had previously been incarcerated, which the court, after a lengthy legal argument, denied. The court dismissed the jury for the remainder of the day, and, when the panel returned the following morning, the court issued a stringent cautionary instruction that Sadler was "mistaken" that Omar and Appellant had been incarcerated together, and that the jury should disregard all of the testimony related thereto. The Commonwealth then attempted to question Sadler regarding his knowledge of the events in question, but Sadler refused to testify,

going so far as to deny the veracity of any statements he made to the grand jury, which had implicated Appellant and Morris in the murders.

The Commonwealth next called the lead Montgomery County Detective in the case, Detective Richard Nilsen. Detective Nilsen testified at length regarding mobile phone records that showed the movements of Appellant and his accomplices during the relevant twenty-four hours, from the area of the Bolen residence, to King of Prussia during the time Pennington was in the Wawa convenience store and Mims was killed, down Interstate 76 into Philadelphia and the area of Fairmount Park where Pennington was killed, back to area of the King of Prussia Best Western, and finally returning to the area of Philadelphia where Appellant resided. Detective Nilsen further testified that the key card authorities suspected Pennington gave to Appellant was used at 3:20 a.m., and again just before 5:00 a.m.

To reinforce the mobile phone records, the Commonwealth then utilized Detective Nilsen to read Sadler's grand jury testimony into the record. As noted, that testimony revealed that Appellant told Sadler that Morris, Jones, and he went to the Best Western in search of their assailants, and that Jones remained in the car with Pennington, while Appellant and Morris went into the Best Western and Appellant "showed" Mims. While Appellant did not tell Sadler what happened after they left the Best Western, Sadler did testify that Appellant indicated that they left the Best Western together with Pennington.

As the Commonwealth concluded its case-in-chief, it attempted to admit into evidence recordings of telephone calls Appellant made to Attorney Alva's office, in which he sought to determine whether counsel had been procured for his co-defendant, Morris. Over counsel's relevancy objection, the trial court admitted the telephone call as evidence of the relationship between Appellant and Morris.

Prior to the defense beginning its case-in-chief, a hearing was held regarding the permissible scope of the Common-

wealth's cross-examination of a proffered defense witness, Tezzie Dunlap. The Commonwealth indicated during the hearing that it intended to cross-examine Dunlap concerning any bias he may have toward the Commonwealth, given that the prosecuting attorney had negative dealings with Dunlap in the past-specifically, that the prosecuting attorney had sent a letter to the Pennsylvania Board of Probation and Parole, objecting to any parole for the currently incarcerated Dunlap, due to Dunlap's recantation of testimony in an unrelated murder case. The trial court indicated that it would permit any questions regarding bias and, accordingly, Attorney Alva (and Appellant) decided not to call Dunlap.

In the end, the jury convicted Appellant of all charges, including three counts of first degree murder, related to the homicides of Mims, Pennington, and Pennington's unborn child. The penalty phase began the next day, with all parties apparently believing that the jury could return verdicts of death for the killings of Morris, Pennington, and her unborn child, despite convictions for the murder of an unborn child, pursuant to 18 Pa.C.S. § 1102(a)(2), carrying no more than a mandatory sentence of life imprisonment. Indeed, counsel for both parties extensively argued to the jury during the penalty phase's closing arguments concerning whether Appellant should be put to death for the murder of the fetus. In the same vein, the trial court comprehensively charged the jury regarding the murder of Pennington's unborn child as a death-eligible homicide, including instructing the members concerning the available aggravating and mitigating factors to consider when deliberating concerning the appropriate penalty for the killing of the unborn child.[4]

At the conclusion of deliberations, the jury informed the trial court that they were deadlocked concerning the appropriate penalty for Appellant's murder of Mims; accordingly, the trial court imposed a term of imprisonment of life without parole. Regarding the murder of Jennifer Pennington, the jury found three aggravating factors: that Appellant had been

---

4. The court similarly charged the jury regarding the homicides of Mims and Pennington.

convicted of another murder either before or at the time of the offense (Mims); the same aggravating circumstance for the unborn child; and at the time of the killing, Appellant had knowledge that Pennington was pregnant. *See* 42 Pa.C.S. § 9711(d)(11) & (17). The jury also found the catch-all mitigating circumstance, citing to the character and background of Appellant and the circumstances of the offense. *Id.* § 9711(e)(8). The jury found that the aggravating factors outweighed the mitigating factor, and returned a verdict of death.

Concerning the murder of Pennington's unborn child, the jury found two aggravating factors: that Appellant had been convicted of two other murders at the time of the offense at issue, specifically Pennington and Mims. *Id.* § 9711(d)(11). The jury then again found the catch-all mitigator, citing the character and background of Appellant and the circumstances of the offense. *Id.* § 9711(e)(8). The jury determined that the two aggravating circumstances outweighed the mitigating factor, and sentenced Appellant to death for the murder of Pennington's unborn child. On July 21, 2009, the trial court formally sentenced Appellant to death for the murders of Pennington and her unborn child, life imprisonment for the murder of Mims, and 42 to 84 years of imprisonment for various other convictions related to the conspiracy to murder Mims, Pennington, and her unborn child, as well as the home invasion of the residence of Malaika Bolen, which was to run consecutively.

On September 10, 2009, the Commonwealth filed a motion to modify Appellant's sentence, seeking to vacate the death sentence for the murder of Pennington's unborn child, realizing that Section 1102(a)(2) prohibited a sentence of death for that murder. In response, on November 10, 2009, Appellant filed a reply in which he also sought to have his death sentence for the murder of Pennington vacated, contending that because the trial court erroneously permitted the jury to consider the death penalty for the unborn child, the death sentence vis-à-vis Pennington's murder violated the Eighth Amendment.

Appellant noted that the Eighth Amendment "imposes a heightened standard for reliability in the determination that death is an appropriate punishment in a specific case." Defendant's Reply to Commonwealth's Motion to Modify Sentence at ¶ 7. He argued that indispensable to this heightened standard is the requirement that accurate information be presented to the jury to ensure the reliability of the penalty phase procedure. *Id.* Appellant averred that the convictions and penalties for the deaths of Pennington and her unborn child were so intertwined that no reasonable jury could separate them, thus rendering "a reasonable likelihood that the jury would not have rendered a death sentence for Jennifer Pennington had the jury properly been precluded from considering the death penalty for the murder of her unborn child." *Id.* at 19. Moreover, the error in having the jury consider the death penalty for the murder of the unborn child so tainted and altered the proceedings, that the only remedy was a new penalty hearing for the murder of Pennington. *Id.* at 20–21.

The Commonwealth responded to the averments contained within Appellant's reply by noting that "even if the death penalty had not been sought for Pennington's unborn child, the Commonwealth still would have been able to use the murder of Pennington's unborn child as an aggravator for Pennington's murder." Commonwealth's Reply to Defendant's Reply to Commonwealth's Motion to Modify Sentence at ¶ 10. The Commonwealth further argued that the court clearly and unambiguously instructed the jury to consider each murder conviction separately, and the court should assume that the jury followed those instructions. *Id.* at 11.

During the pendency of the motion to modify Appellant's sentence, various petitions and motions were filed that, in the end, resulted in Appellant obtaining new counsel from the Montgomery County Public Defender's Office. Finally, on October 25, 2011, the court issued an order vacating the sentence of death vis-à-vis Pennington's unborn child and imposing a sentence of life imprisonment for the same, but leaving the remainder of the judgment of sentence unchanged, including the death sentence from Pennington's murder. In

its Rule 1925(a) opinion, the trial court would later expound its belief that "an error as to one death sentence does not require a new sentencing hearing on the other." *Commonwealth v. Murray*, Docket No. 5181–05, *slip op.* at 15 (CP Montgomery, July 24, 2012) (hereinafter, "Tr. Ct. Op."). This appeal followed.

## II. Guilt Phase Issues

### A. Sufficiency of the Evidence

 Despite Appellant's failure to challenge the sufficiency of the evidence supporting his conviction of the first degree murder of Jennifer Pennington, "in all capital direct appeals, this Court reviews the evidence to ensure that it is sufficient to support the first-degree [sic] murder conviction." *Commonwealth v. Sanchez*, 614 Pa. 1, 36 A.3d 24, 37 (2011); *see also Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).[5] In reviewing the sufficiency of the evidence, we examine whether the evidence presented and admitted at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as the verdict winner, support the jury's verdict beyond a reasonable doubt. *Commonwealth v. Montalvo, N.*, 598 Pa. 263, 956 A.2d 926, 932 (2008). Whether sufficient evidence exists to support the verdict is a question of law; our standard of review is *de novo* and our scope of review is plenary. *Sanchez*, 36 A.3d at 37.

 "To obtain a first-degree [sic] murder conviction, the Commonwealth must demonstrate that a human being was unlawfully killed, the defendant perpetrated the killing, and

5. In light of the jury imposing a life sentence for the murder of Mims, and the unchallenged vacatur of the death sentence for the murder of Pennington's unborn child, we will only review the sufficiency of the evidence to convict Appellant of first degree murder in the death of Pennington. *See* 42 Pa.C.S. § 9711(h)(1); *Sanchez*, 36 A.3d at 37. Appellant has not challenged the sufficiency of the evidence to convict him of first degree murder in the deaths of Mims and Pennington's unborn child, and therefore any contentions of the same are waived. Pa. R.A.P. 302(a).

the defendant acted with malice and a specific intent to kill." *Commonwealth v. Montalvo, M.,* 604 Pa. 386, 986 A.2d 84, 92 (2009) (quoting *Commonwealth v. Kennedy,* 598 Pa. 621, 959 A.2d 916, 921 (2008)); *accord* 18 Pa.C.S. § 2502(a) & (d) (defining first degree murder as an "intentional killing," which is further defined as a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing."). The Commonwealth may prove the specific intent to kill necessary for first degree murder wholly through circumstantial evidence. *Commonwealth v. Rega,* 593 Pa. 659, 933 A.2d 997, 1009–10 (2007).

 To that end, "the jury may convict the defendant as an accomplice so long as the facts adequately support the conclusion that he or she aided, agreed to aid, or attempted to aid the principal in planning or committing the offense, and acted with the intention to promote or facilitate the offense." *Commonwealth v. Markman,* 591 Pa. 249, 916 A.2d 586, 597 (2007). The amount of aid may be insubstantial, so long as such aid was offered to the principal as assistance in committing the crime. *Id.* at 597–98. Nevertheless, "simply knowing about the crime or being present at the scene is not enough." *Id.* at 598. Rather, and specific to first degree murder, the evidence must prove that the defendant "possessed the requisite specific intent to kill, even if [the jury] determined that he was not the person who actually pulled the trigger." *Commonwealth v. Johnson, R.,* 572 Pa. 283, 815 A.2d 563, 580 (2002). Finally, specific intent to kill may be inferred by the use of a deadly weapon upon a vital organ of the body. *Commonwealth v. Spell,* 611 Pa. 584, 28 A.3d 1274, 1278 (2011).

 Instantly, the evidence produced at trial by the Commonwealth, and all reasonable inferences deduced therefrom, when taken in a light most favorable to the Commonwealth, *see Montalvo, N.,* 956 A.2d at 932, support the jury's verdict of first degree murder in the death of Pennington on a theory of accomplice liability, given that the evidence presented by the Commonwealth indicates that Morris shot Pennington with

the .357 revolver with Appellant's full knowledge and participation. Immediately following the robbery of Appellant and Morris by Mims and Brewer, Appellant and Morris, joined by Maurice Jones, began a twenty-four hour search for Pennington—beginning at Malaika Bolen's house, and finally ending at the Wawa in King of Prussia. The eyewitness testimony of Bolen regarding the types of weapons wielded by Appellant and Morris—the AK-47 rifle and .357 revolver, respectively—match the bullets recovered from the Mims and Pennington murder scenes. Further, Eric Sadler's grand jury testimony, which the jury was free to believe all, some, or none of, revealed Appellant's admissions that he and his cohorts hunted Mims and Pennington, found them in King of Prussia, murdered Mims, and gave Pennington drugs while holding her against her will.

The testimony of Detective Nilsen regarding the tracking of the actors' cell phones and use of the Best Western key card corroborates Sadler's version of events, and further continues the saga, where Sadler stopped. According to the cell phone records, after the approximate time of Mims' death, Appellant and Morris traveled from King of Prussia to the Fairmount Park area only minutes before Pennington's body was discovered. Those same records then show Appellant and Morris returning to the area of the King of Prussia Best Western, where the key card records indicate someone reentered the room. Given that Mims and Pennington were both dead by this point, the fair inference is that Appellant and Morris were the ones who reentered the room.

Finally, regarding Pennington's murder in Fairmount Park, her body was discovered with two bullet wounds to the face and head, consistent with being shot with a .357 firearm. While, at all relevant times, it appears that Morris controlled and used the .357 revolver, the above-stated evidence clearly indicates that Appellant, Morris, and Jones acted in concert with each other throughout the night, including the kidnapping and killing of Pennington. The clear intent of Appellant during the twenty-four hours in question was to hunt down and kill those whom he suspected of robbing him on January

30, 2005: Mims and Pennington. Given the evidence alluded to above, we have no difficulty in concluding that sufficient evidence existed to convict Appellant of Pennington's first degree murder on a theory of accomplice liability.

## B. Violation of Pa. R.Crim.P. 801

Appellant's first substantive allegation of error revolves around his contention that Attorney Alva did not meet the CLE education requirements of Rule 801, *supra* note 2, and therefore was not permitted to represent him during the guilt phase of his trial. Appellant concedes that, because Attorney Alva initially entered his appearance in this case on September 13, 2005, Attorney Alva was only required to have completed a minimum of six hours of CLE capital case training in order to be eligible to represent Appellant, as that was the number of educational hours needed at the time he entered his appearance. Appellant's sole contention is that the trial court erred in finding that Attorney Alva met that requirement.

To that end, Appellant emphasizes that a different trial judge removed Attorney Alva prior to the first trial commencing, in favor of another attorney who unquestionably satisfied the Rule 801 mandates. Appellant then states that, in his view, Attorney Alva "equivocated as to whether he met the educational requirements at the time of his entry of appearance...." Appellant's Brief at 31 (referring to the exchange between Attorney Alva and the trial court quoted *supra,* pp. 8–9). Given Attorney Alva's removal, and then the supposed "equivocation" as to Attorney Alva's qualifications, Appellant contends that the trial court relied upon facts not of record in finding that he satisfied the Rule 801 requirements as of the date of entry of his appearance.

Tangentially, Appellant further takes umbrage with the trial judge's consultation with the Montgomery County Criminal Division Administrative Judge regarding the proper interpretation of Rule 801. Calling the conversation an improper *ex parte* communication, Appellant alleges that the "consultation not only makes for a muddled record, it violates due process of

law." *Id.* at 32 (citing *Yohn v. Love,* 76 F.3d 508, 516 (3d Cir.1996)).

Finally regarding this issue, Appellant contends that any error regarding Rule 801 is not harmless, as magnified by the fact that this Court has previously found Attorney Alva ineffective in a capital case in which he served as penalty phase counsel. *See Commonwealth v. Ford,* 570 Pa. 378, 809 A.2d 325 (2002) (finding Attorney Alva, upon his own admission, did not effectively investigate or present mitigation evidence). Appellant highlights the dubious error in this case of presenting to the jury the first degree murder of Pennington's unborn child as a death-eligible offense. "[T]here can be no question ... that this oversight on the part of the defense was deficient." Appellant's Brief at 35.

In response, the Commonwealth avers that the entirety of Appellant's contentions regarding Rule 801 and Attorney Alva's compliance therewith are waived because Appellant did not make a contemporaneous objection to the trial court's ruling that Attorney Alva was eligible to represent him at trial. Just the opposite, the Commonwealth states, Appellant insisted during the hearing that Attorney Alva represent him at trial. *See* N.T., Mar. 3, 2009 at 34–41.

On the merits, the Commonwealth counters by noting that the plain language of Rule 801, as correctly utilized by the trial court, only requires the attorney in question to have completed the educational requirements of Rule 801 within three years of the attorney's entry of appearance. Thus, so long as Attorney Alva met the requirements of Rule 801 on September 13, 2002, three years prior to the entry of appearance, he was qualified to represent Appellant in this case. Citing to the above-quoted examination of Attorney Alva, the Commonwealth contends that the only "equivocation" regarding his qualifications at the time of entry was to whether he had eighteen hours of capital case CLE credits, not the required six. Indeed, the Commonwealth notes, during that examination the Court affirmatively stated that Attorney Alva possessed at least six death penalty education credits at the time of his entry of appearance. In response, Attorney Alva

stated that he could not "aver as an officer of the Court that I had the full 18," N.T., Mar. 3, 2009 at 30, but never equivocated regarding the required six credits.

Concerning whether the trial judge's consultation with the criminal division administrative judge constituted an improper *ex parte* communication, the Commonwealth asserts that the *Yohn* Court found such a violation only because, in that case, the prosecuting attorney and federal district court judge had a telephone conversation with the then Chief Justice of this Court concerning the Pennsylvania Wiretap Act. *See Yohn,* 76 F.3d at 516–17. Importantly, in the Commonwealth's view, defense counsel in *Yohn* did not participate in that telephone call, thus rendering it an impermissible *ex parte* communication involving one lawyer and the judges, and excluding counsel from the adverse party. In contrast, a conversation between two judges concerning a legal issue is not an *ex parte* communication and does not deprive anyone of due process. The Commonwealth notes that Appellant does not cite to any case that supports his proposition outside of the inapt reference to *Yohn.*

We address first the Commonwealth's contention of waiver. A difficulty presents itself at the outset because two different manners of waiver are actually implicated here: (1) traditional, issue preservation waiver as contemplated by Pa. R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); and (2) the prohibition contained within the comment to Pa. R.Crim.P. 801 that "the educational and experience requirements of the rule may not be waived by the trial or appellate court." Put differently, Rule 801 proscribes courts from "setting aside" the educational mandates in favor of permitting unqualified counsel to participate in the trial. The confluence of these two notions of waiver in the instant appeal demonstrate the Hobson's choice with which defendants in Appellant's position are faced, because advocating for one's choice of counsel and objecting to a court's appointment of that choice of counsel are mutually exclusive. Thus, we expect that the majority of defendants will not preserve an objection on an issue in which

they received a favorable ruling, permitting representation by the defendant's choice of counsel.

Moreover, neither party has given us adequate advocacy on how to untangle this Gordian knot. The Commonwealth, as Appellee, makes the obvious "issue preservation waiver" argument due to Appellant's failure to lodge an objection in the trial court, while Appellant responds in his reply brief that waiver cannot exist merely because the trial court held a full merits hearing concerning Attorney Alva's qualifications under Rule 801. While this Court generally is loath to decide the merits of issues before examining questions of waiver, we find both sides' positions facially meritorious but substantially underdeveloped. Because of the lack of advocacy on this important issue, we believe the better course is to decide the relatively straightforward merits question, given that the arguments thereon are fully developed.

To that end, we disagree with Appellant's contention that the trial court's finding that Attorney Alva met the six-hour educational requirement of Rule 801 is not supported by the record because Attorney Alva "equivocated" concerning his compliance. As the Commonwealth points out, Attorney Alva only "equivocated" concerning whether he had eighteen hours of capital case CLE credits in the three years leading up to his entry of appearance. This "equivocation" seems to be the result of the contention during the March 3 hearing over whether Attorney Alva needed the credit hours required at the time of the hearing being conducted (eighteen), or at the time he entered his appearance in 2005 (six). As noted, the parties now agree that he only needed six credits.

Further, Appellant ignores the additional evidence presented by Attorney Alva, including his status as a CLE presenter on capital case litigation, for which he received double CLE credits, and his significant history as one of the most experienced capital trial defense attorneys in the Commonwealth. Based upon this testimony, the trial court, as the sole arbiter of the credibility of Attorney Alva's testimony, concluded that Attorney Alva possessed the six hours of capital case CLE credit he needed at the time of his entry of appearance in

September, 2002, and given the facts of record, we see nothing upon which to disturb that factual finding. *See, e.g., Commonwealth v. Fahy*, 512 Pa. 298, 516 A.2d 689, 694–95 (1986) (holding that the finders of fact are free to believe all, some, or none of the evidence presented to it, and are further the sole resolvers of issues of credibility; decisions made by finders of fact in these regards will not be disturbed on appeal).

 Concerning whether the trial court violated notions of due process by partaking in an *ex parte* communication with the administrative judge of the criminal division, Rule 302(a) issue preservation waiver is applicable and evident due to Appellant's failure to lodge an objection at the time the court revealed, during the March 30, 2009 hearing, that it had consulted with the administrative judge. *Montalvo, N.*, 956 A.2d at 936 ("in order to preserve a claim on appeal, a party must lodge a timely objection"); Pa. R.A.P. 302(a). Even were the issue not waived, the Commonwealth is correct in its interpretation of *Yohn:* an *ex parte* communication, by definition, involves the inclusion of one party in a consultation with a judge over the exclusion of another. *Accord* BLACK'S LAW DICTIONARY (9th ed. 2009) (defining an *ex parte* communication as "a communication between counsel and the court when opposing counsel is not present").[6]

## C. Photographs of Jennifer Pennington

Next, Appellant contends that the trial court applied an incorrect standard in considering the admissibility of photo-

---

6. In holding that the consultation between two members of the judiciary does not constitute an *ex parte* communication, we further note that such communication is not only permissible, but commendable, especially when one of those members possesses years of experience in a particular area of the law (such as an administrative judge of a specific trial division). This is certainly true in a case such as that presented instantly where precedential law is sparse and the rule in question is fairly new. Indeed, while the Pennsylvania Rules of Judicial Conduct are silent regarding judge-to-judge consultations, judicial conduct provisions from several other states explicitly permit "a judge [to] consult with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities or with other judges." *See, e.g.,* Code of Judicial Conduct Canon 3B(7) for the States of Arkansas, Florida, Maryland, and Nevada.

graphs taken of Jennifer Pennington's body in Fairmount Park. Importantly, Appellant does not dispute the admissibility of the photographs themselves at this stage. Rather, citing to *Commonwealth v. Johnson, H.,* 615 Pa. 354, 42 A.3d 1017, 1033–34 (2012), he argues that the trial court was required to "decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors." Appellant avers that the trial court did not consider a "need assessment," Appellant's Brief at 52, and thus applied an erroneous legal standard in considering the photographs, further rendering the admission of the photographs an abuse of discretion.

The Commonwealth counters that the "need" for the photographs was self-evident from the oral argument concerning their admissibility and the trial court's order admitting the pictures: that they "were necessary to depict the context in which the shootings occurred, to show the defenselessness of the victims, to demonstrate the specific intent to kill, and that the photographs were necessary to assist the medical examiner in describing the wounds to the jury." Commonwealth's Brief at 34. The Commonwealth further notes that Pennsylvania evidentiary law is clear that graphic, even inflammatory, photographs of murder victims are relevant and admissible to demonstrate and prove specific intent to kill, *see Commonwealth v. Malloy,* 579 Pa. 425, 856 A.2d 767, 776–77 (2004), and to provide the jury with the best possible understanding of the crime itself. *See Commonwealth v. Jacobs,* 536 Pa. 402, 639 A.2d 786, 789 (1994).

▮▮▮▮ The admission of evidence is solely within the province of the trial court, and a decision thereto will not be disturbed absent a showing of an abuse of discretion. *Commonwealth v. Mitchell,* 588 Pa. 19, 902 A.2d 430, 452 (2006). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias[,] or ill-will discretion ... is abused." *Commonwealth v. Chamberlain,*

612 Pa. 107, 30 A.3d 381, 422 (2011) (quoting *Commonwealth v. Wright,* 599 Pa. 270, 961 A.2d 119, 142 (2008)) (ellipsis in *Chamberlain* ).

▮▮▮▮▮ As Appellant correctly notes, when the Commonwealth proffers photographs of a homicide victim for admission into evidence, the trial court must engage in a two-part analysis:

> First a [trial] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

*Johnson, H.,* 42 A.3d at 1033–34 (quoting *Commonwealth v. Tharp,* 574 Pa. 202, 830 A.2d 519, 531 (2003)). Despite his accurate recitation of the law, Appellant's averment that the trial court did not conduct the necessary balancing of the evidentiary need of the photographs with their inflammatory nature is belied by the record. Appellant points specifically to the trial court's ruling from the bench during trial, "You show me in the case law where it talks about need," as proof that the trial court did not properly weigh the need for the evidence. N.T., Apr. 17, 2009 at 9–10.

A reading of the entirety of the proceeding from April 17, 2009 reveals, however, that the trial court explicitly understood the balancing test and weighed the inflammatory nature of the photographs against the Commonwealth's "need" of using them. *See, e.g., id.* at 15 ("They [the Commonwealth] proffer that they need [the photographs] in this particular case. I have to minimize the inflammatory nature. But when I do the balancing test, so far every time I come up with it, I come up with the idea that I see wounds, I see stippling that is going to support [the Commonwealth].");[7] *id.* at 20 ("I as-

---

7. "Stippling" is gunshot residue consisting of the unburned powder and debris that is discharged from a firearm that is "tattooed" onto a shooting victim's skin in the form of pinpoint abrasions.

sume you'll lay a sufficient factual basis, Attorney Steele [the prosecuting attorney], at the time you're going to ask to see the photographs, as to why a photograph at this stage would be necessary and for [the medical examiner] to be able to show you a stippling effect."). Accordingly, as we discern no error in the trial court's process of admitting the photographs, we therefore find no abuse of discretion.

### D. Excited Utterance by Jennifer Pennington

Appellant next avers that the trial court erred in admitting Vernon Brewer's testimony that, while he, Pennington, and Mims were in the Best Western Hotel and Pennington was using the stolen mobile phones, during one such telephone call Pennington "started spazzing out, 'Oh my God, they're going to kill me. They're going to kill me.' " N.T., Apr. 15, 2009 at 153. As noted above, Attorney Alva objected to the statement as impermissible hearsay, which the trial court overruled from the bench, but without reasoning as to why. In its Rule 1925(a) opinion, the trial court explained that it viewed Pennington's statement as an excited utterance that was properly excepted from the hearsay prohibition. The court reasoned that "Pennington was in fear for her life when she uttered the statement." *Murray*, Tr. Ct. Op. at 22.

Appellant contends that admitting the evidence under the excited utterance exception to the hearsay rule was improper, because the common law understanding of the exception requires "certain foundational elements which must be introduced in order to admit an excited utterance into evidence," specifically: (1) that an exciting event occurred; and (2) that the declarant participated in or closely witnessed the exciting event. Appellant's Brief at 56 (citing *Allen v. Mack*, 345 Pa. 407, 28 A.2d 783 (1942); *Siano by Siano v. WCAB (Dileo's Restaurant, Inc.)*, 137 Pa.Cmwlth. 487, 586 A.2d 1008, 1010–11 (1991)). Appellant argues that the Commonwealth presented no foundational evidence concerning what "exciting event" Pennington witnessed or partook in at the time of her statement.

The Commonwealth responds that when the statement is taken in the context of the entirety of Brewer's testimony, it becomes clear that Pennington's life had been threatened. Indeed, the Commonwealth notes that immediately after Pennington uttered the statement, Brewer immediately felt the same fear, saying to his acquaintances, "we might have hit the wrong people this time." N.T., Apr. 15, 2009 at 153. The Commonwealth does not dispute the necessity of establishing the "foundational elements" alluded to above, but instead avers that it laid the necessary foundation: "It is clear from the context in which Mr. Brewer testified that Ms. Pennington had just been confronted by something terribly shocking during that phone call that caused her to believe that she was going to be murdered." Commonwealth's Brief at 38. In the Commonwealth's view, only something as startling as a death threat would have caused Pennington to "spaz out" and blurt out "they're going to kill me." Alternatively, the Commonwealth avers that any error in admitting the statement was harmless, given the ample evidence of record that Appellant and his cohorts were hunting Pennington and, in the end, killed her.

As is well-settled, excited utterances fall under the common law concept of *res gestae*. *Commonwealth v. Pronkoskie*, 477 Pa. 132, 383 A.2d 858, 860 (1978). *Res gestae* statements, such as excited utterances, present sense impressions, and expressions of present bodily conditions are normally excepted out of the hearsay rule, because the reliability of such statements are established by the statement being made contemporaneous with a provoking event. *Id.* While the excited utterance exception has been codified as part of our rules of evidence since 1998, *see* Pa.R.E. 803(2), the common law definition of an excited utterance remains applicable, and has been often cited by this Court:

[A] spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person has just participated in or closely witnessed, and made in reference to some phase of that occurrence

which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties. . . . Thus, it must be shown first, that [the declarant] had witnessed an event sufficiently startling and so close in point of time as to render her reflective thought processes inoperable and, second, that her declarations were a spontaneous reaction to that startling event.

*Commonwealth v. Sherwood*, 603 Pa. 92, 982 A.2d 483, 495–96 (2009) (quoting *Commonwealth v. Stokes*, 532 Pa. 242, 615 A.2d 704, 712 (1992)). The circumstances surrounding the statements may be sufficient to establish the existence of a sufficiently startling event. *See Commonwealth v. Counterman*, 553 Pa. 370, 719 A.2d 284, 299 (1998) (statement by children, who ultimately perished in a house fire, that their father was lighting a fire inside the house was admissible when, minutes later, the house became ablaze); *Commonwealth v. Sanford*, 397 Pa.Super. 581, 580 A.2d 784, 788 (1990) (finding the excited utterance exception applicable where the testimony of the child's mother and physician circumstantially established the event evincing that the child perceived "some unexpected or shocking occurrence").

We agree with the Commonwealth that the circumstances of the statement, including the sheer magnitude of the events of January 30 and 31, 2005, certainly provide a circumstantial context where Pennington's life could have been, and indeed was, threatened. Adding to the circumstances was Brewer's own fear that their lives may be in danger. A threat upon one's life is certainly a startling event, and Pennington's "spazzing" reaction of "Oh my God, they're going to kill me. They're going to kill me," unquestionably constitutes "a spontaneous reaction to the startling event." *Counterman*, 719 A.2d at 299. As noted *supra*, Part II.C, we will not reverse an evidentiary ruling by the trial court absent an abuse of the court's discretion. *Chamberlain*, 30 A.3d at 422; *Mitchell*, 902 A.2d at 452. Given the circumstances surrounding Pennington's statement, we perceive no abuse of that discretion in admitting the excited utterance.

### E. Denial of a Mistrial Following
### the Testimony of Eric Sadler

■ Appellant's next contention concerns the trial court's denial of a mistrial after Eric Sadler indicated during his testimony that his brother, Omar, and Appellant had previously been incarcerated together. Appellant does not argue the merits of the denial of the mistrial. Rather, he takes umbrage with the trial court "consult[ing] with a couple of other judges" during a recess before the court gave its final ruling concerning the motion. The entirety of Appellant's argument is as follows:

> As argued above in [Part II.B, concerning Rule 801 ...] such *ex parte* communications about a pending matter violate a criminal defendant's right to be heard and his right to counsel, and fundamentally undermines the integrity of the proceedings. Such a consultation when considering the mistrial motion, constitutes an abject abuse of discretion.

Appellant's Brief at 54. The Commonwealth responds in the same manner as above: consultations between judges do not constitute *ex parte* communications by definition, as such only occur when one party is included within a discussion with a judge at the exclusion of the other parties. As we held above in Part II.B, the Commonwealth is correct, and thus Appellant is not due relief on this issue for the same reasons.

### F. Recordings of Telephone Calls between
### Appellant and Attorney Alva

■ Appellant next argues that the trial court's admission of the audio and transcript of a telephone call he made from prison to Attorney Alva's office, in which he inquired about representation for one of his co-defendants, was in error as violative of the attorney-client privilege. We need not delve into Appellant's substantive discussion of this issue, however, because as the Commonwealth correctly notes, the issue is waived. At trial, Appellant objected to the admission of the telephone call, but only upon relevance grounds. Appellant then lodged a second objection concerning the publication of the transcript of the call to the jury. At no time did Appellant

argue that the contents of the telephone call were protected by the attorney-client privilege. Accordingly, his argument to that end is waived. Pa. R.A.P. 302(a); *see also Commonwealth v. Gilmore*, 464 Pa. 464, 347 A.2d 305, 307 (1975) (holding that preservation of the specific argument in support of the ground for reversal is required for appellate review).

## G. *Testimony of Tezzie Smith*

In his final contention of error regarding the guilt phase, Appellant argues that the trial court erred in denying his motion *in limine* seeking to prevent the Commonwealth from cross-examining Smith regarding any bias Smith may have had against the prosecuting attorneys. As noted above, this alleged bias surrounded Smith's recantation of testimony in a prior trial, and the resultant negative letter sent by the Montgomery County District Attorney's Office to the Pennsylvania Board of Probation and Parole. Appellant makes no substantive argument, however, as to why the potential bias evidence should not have been probed, other than to say such bias could only be shown through "extrinsic evidence ... to draw a tenuous inference of bias...." Appellant's Brief at 60. From that, Appellant asserts that he chose not to call Smith as a witness, and then leaps to a bald and unsupported claim that his Sixth Amendment right to present a defense and Fourteenth Amendment right to due process were accordingly violated. *Id.* at 61 (citing *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (requiring that "criminal defendants be afforded a meaningful opportunity to present a complete defense")).

The Commonwealth responds that "[e]vidence of bias, interest, or corrupt motive" is generally admissible and a proper inquiry on cross-examination. Commonwealth's Brief at 44 (citing *Commonwealth v. Birch*, 532 Pa. 563, 616 A.2d 977, 979 (1992)). The decision to permit or limit such examinations is a matter within the sound discretion of the trial court. *Chamberlain*, 30 A.3d at 422; *Mitchell*, 902 A.2d at 452. The Commonwealth expounds that it intended to cross-examine Smith regarding his recantation of testimony in an-

other capital murder case that was proceeding in Montgomery County at the same time as Appellant's first trial. When Smith attempted to recant that testimony, one of the prosecuting attorneys in the instant case wrote a letter to the Board of Probation and Parole, objecting to any parole for Smith. The Commonwealth asserts that it merely was planning on questioning Smith to inquire into any potential prejudice or bias he may have had against the Commonwealth as a result of that letter.

In framing his allegation of error in terms of constitutional violations, Appellant does nothing more than cite to cases from the United States Supreme Court, each of which stand for the well-established, but general, proposition that the government cannot deprive a defendant of the opportunity to present a complete defense. In *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), one of the cases cited to by Appellant, the High Court, while recognizing this black-letter rule, also noted that the Court has "never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." *Id.* at 690, 106 S.Ct. 2142. Only when an evidentiary rule or ruling completely infringes upon a defendant's ability to present evidence are the Sixth or Fourteenth Amendments implicated. *Id.* at 691, 106 S.Ct. 2142; *see also Trombetta*, 467 U.S. at 485, 104 S.Ct. 2528; *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

Other than articulating the general standards established in *Crane, Trombetta,* and *Chambers,* Appellant makes no argument concerning how those general standards were violated in this case. Contrarily, our review of the record demonstrates that Appellant was not denied any ability to present evidence; rather, counsel made a calculated decision not to call Smith to testify after the Commonwealth indicated its intent to cross-examine him regarding any potential bias. As this Court noted in *Commonwealth v. Abu–Jamal:*

> Bias is a term used in the "common law of evidence" to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' [sic] like, dislike, or fear of a party, or by the witness' [sic] self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' [sic] testimony.

521 Pa. 188, 555 A.2d 846, 853 (1989) (quoting *United States v. Abel*, 469 U.S. 45, 53, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984)).

Under this well-established rule, the trial court made an informed, and indeed correct, decision regarding the legality of questioning Smith regarding bias. The court applied "evidentiary rules that ... serve the interests of fairness and reliability," *Crane*, 476 U.S. at 690, 106 S.Ct. 2142, and merely because Appellant chose not to call Smith in light of that ruling, it does not follow that he was denied the right to present a complete defense or due process of law. This claim lacks merit, and is rejected.

### III. Penalty Phase Issues

*A. Legality of the Imposition of the Death Penalty for the Murder of Jennifer Pennington*

In regard to the penalty phase, neither party disputes that the submission of the first degree murder of Jennifer Pennington's unborn child to the jury for consideration for the death penalty was not just inappropriate, but illegal. *See* 18 Pa.C.S. § 1102(a)(2). Indeed, that error has been corrected, as the trial court properly vacated the sentence of death for that conviction, and replaced it with a mandatory term of imprisonment of life without parole upon learning of the error. Appellant contends, however, that the submission of the murder of the unborn child for death penalty consideration further tainted the sentence of death as it applies to Pennington's murder. Appellant raises "two overarching points" for the proposition that a fundamental breakdown in capital proceed-

ings and the administration of justice occurred, and that he is accordingly due a new penalty hearing.

First, Appellant argues that the jury's erroneous belief that it was authorized to sentence Appellant to death for the murder of Pennington's unborn child impacted and tainted the jury's consideration of the death penalty for Pennington's murder. Appellant notes that in one of the United States Supreme Court's seminal decisions concerning capital punishment, *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the High Court held that a jury may not be misled "as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Romano v. Oklahoma*, 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (citing *Caldwell*, 472 U.S. at 336, 105 S.Ct. 2633 & *Darden v. Wainwright*, 477 U.S. 168, 184 n. 15, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)). Appellant notes that *Caldwell*, *Darden*, and *Romano* went on to impose upon a defendant the burden of showing that the trial court improperly explained to the jury its role as prescribed under local law. *See, e.g., Romano*, 512 U.S. at 8, 114 S.Ct. 2004. Appellant argues that in the instant case, the trial court clearly misled the jury by instructing it to consider a capital sentence for the first degree murder of Pennington's unborn child, which Pennsylvania law does not authorize.

Appellant's second "overarching point" revolves around the erroneous procedure employed by the trial court in instructing the jury concerning the possible death sentences. Appellant notes that since *Gregg v. Georgia*, the High Court has concentrated primarily upon the procedure utilized in capital sentencing, dominated by the factor that "accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die...." 428 U.S. 153, 190, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Appellant argues that the breakdown in the procedure in this case is magnified due to the failure of two veteran defense attorneys, two highly-skilled prosecuting attorneys, and an experienced trial judge, all intimating to a jury for three weeks that Appellant's murder of Pennington's unborn child

made him eligible for the death penalty. Appellant avers that such a fundamental error in the most serious of criminal cases implicates this Court's duty to ensure "that capital punishment in this Commonwealth comports with the Constitution of the United States...." Appellant's Brief at 39–40 (quoting *Commonwealth v. McKenna*, 476 Pa. 428, 383 A.2d 174, 181 (1978)).[8]

The Commonwealth responds that the error in the submission of the murder of Pennington's unborn child for capital punishment consideration does not require a new sentencing hearing focused exclusively upon the murder of Pennington. The Commonwealth argues that the aggravating and mitigating circumstances for each of the three murders were different, and the court gave and instructed the jury concerning three separate verdict slips. Importantly, in the Commonwealth's view, neither the instructions nor the verdict slip regarding Jennifer Pennington's murder were in error. To that end, the Commonwealth notes that notwithstanding the erroneous submission of the unborn child's murder to the jury for death penalty consideration, the jury would still have been able to consider the unborn child's death as an aggravating circumstance related to Pennington's murder. Thus, the Commonwealth notes that the impermissible submission did not alter or enhance its case in any way; the jury would still have heard all the evidence relevant to the death of the unborn child during the penalty phase and properly considered that evidence as an aggravator in assessing life or death for Pennington's murder.

The Commonwealth additionally avers that cases such as *Romano* and *Caldwell* are inapposite for the same reason: because the jury would have considered Pennington's unborn

8. We note that Appellant further makes a third argument under the Pennsylvania Constitution, but merely does so to emphasize his belief that the Pennsylvania Constitution "analogues to the United States Constitution's protections against cruel and unusual punishments (Eighth Amendment) and guarantee of due process of law (Fourteenth Amendment)...." Appellant's Brief at 43. Appellant requests that, should we find that the United States Constitution was violated herein, we likewise find a breach of the Pennsylvania Constitution.

child's death as an aggravating circumstance, any contention that the jury's sense of responsibility was diminished is specious. The Commonwealth contends that the jury was not misled regarding its role in the sentencing process, as "[t]here was nothing inaccurate or false about the four aggravating factors presented to the jury pertaining to the first degree murder of Jennifer Pennington." Commonwealth's Brief at 25. The Commonwealth contends that *Caldwell* specifically is not implicated by this case, because *Caldwell* concerned improper comments by the prosecuting attorney that the ultimate responsibility for carrying out the death penalty rested with someone other than the jury members. *Caldwell*, 472 U.S. at 328–29, 105 S.Ct. 2633. No such comment was made here. Rather, in the Commonwealth's view, this issue concerns solely the validity of the procedure surrounding the sentence of death for Pennington's murder, and no error appears on the record regarding that precise question.

 "[D]eath as a punishment is unique in its severity and irrevocability." *Gregg*, 428 U.S. at 187, 96 S.Ct. 2909. As a result, the United States Supreme Court "has been particularly sensitive to insure that every safeguard is observed" whenever a defendant's life is at stake. *Id.* Despite the ultimate punishment being at issue, the majority of states, Pennsylvania included, have given the sole authority of imposing a sentence of death to jurors: twelve laypersons who "will have had little, if any, previous experience in sentencing, [and are] unlikely to be skilled in dealing with the information they are given." *Id.* at 192, 96 S.Ct. 2909. Accordingly, just as in any matter that comes to trial in the whole of American jurisprudence, juries must be given accurate guidance by trial judges in order for the members to render their verdicts. *Id.* at 193, 96 S.Ct. 2909. "When erroneous instructions are given, retrial is often required. It is quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations." *Id.* If the possibility exists that the jury returned a verdict of death upon an erroneous ground, a remand for resentencing is required. *Mills v.*

548

*Maryland,* 486 U.S. 367, 377, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

The question thus has raged for almost forty years since the re-imposition of capital punishment in America: what constitutes an erroneous ground? With an assurance that the punishment of death is proportionate to the crime charged, *cf. Kennedy v. Louisiana,* 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) (holding that the Eighth Amendment prohibits the punishment of death for a defendant convicting of raping a child), "the States enjoy their traditional latitude to prescribe the method by which those who commit murder shall be punished." *Romano,* 512 U.S. at 7, 114 S.Ct. 2004 (quoting *Blystone v. Pennsylvania,* 494 U.S. 299, 309, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990)). In adhering to the prohibition against the arbitrary and capricious imposition of the death penalty, however, the High Court's "principal concern has been more with the *procedure* by which the State imposes the death sentence than with the substantive factors the State lays before the jury as a basis for imposing death, once it has been determined that the defendant falls within the category of persons eligible for the death penalty." *Id.* at 8, 114 S.Ct. 2004 (quoting *California v. Ramos,* 463 U.S. 992, 999, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983)) (emphasis in *Romano* ).

We have, of course, no evidence, explicit or implicit, to assist us in determining what the jury in this case considered in fashioning the sentences of death for Pennington and her unborn child. What we do have, however, is uncontradicted evidence that the jury was misinformed regarding the availability of the death penalty as a punishment for Appellant's murder of the unborn child. Indeed, the jury was instructed at length that the unborn child's murder was a death-eligible conviction, which aggravating and mitigating circumstances were available for consideration for that murder, and how the jury should proceed in considering the proper penalty for that murder. Respectfully, that the murder of Pennington's unborn child was submitted to the jury as a death-eligible

offense is shocking and calls into question the validity of the penalty phase as a whole.

In that light, Appellant attempts to connect this case to *Caldwell*, in which a prosecutor's statement (and trial judge's affirmation of that statement) that misled the jury regarding its responsibility in the capital punishment process constituted reversible error that mandated a new penalty hearing, because such statements "diminished the jury's sense of responsibility." *Caldwell*, 472 U.S. at 342, 105 S.Ct. 2633 (O'Connor, J., concurring). The Commonwealth counters that *Caldwell* is inapt to this case because the jury would have heard, and therefore considered, evidence regarding the death of the unborn child as it was an aggravating factor in the Pennington murder. Indeed, the jury unanimously found that the death of her unborn child constituted two aggravating factors in Pennington's death: that Appellant was convicted of another murder before or at the time of Pennington's, and Appellant had knowledge that Pennington was pregnant at the time of her murder, both of which were properly tendered to and found by the jury. Given this, the Commonwealth has contended that the jury's sense of responsibility was not diminished. Quite the opposite: according to the Commonwealth, the panel fully understood their responsibility, found aggravating and mitigating circumstances relevant to the murder of Pennington, weighed them against each other, and determined that the penalty of death was appropriate.

 This is a capital case, subjected to the closest scrutiny, and the error presented in this case is so egregious that we find it necessary to vacate the sentence of death in regard to Pennington, and remand for a new penalty hearing. First, as the High Court noted in *Mills*, the benchmark for determining whether a new penalty phase is required is whether "there is at least a substantial risk that the jury was misinformed." *Mills*, 486 U.S. at 381. Here, we are presented with more than a substantial risk that the jury was misinformed; all agree that the jury was, in fact, explicitly misin-

formed.[9] The court charged the jury that it could return a sentence of death for the murder of Pennington's unborn child,[10] and we cannot be certain that this erroneous instruction did not play a role in the jury's consideration of the death penalty for Pennington's murder. *Accord Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), *overruled on other grounds, Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). We find obvious that this error implicates "the procedure by which the State imposes the death sentence," *Romano*, 512 U.S. at 8, 114 S.Ct. 2004 and therefore requires a new penalty hearing.

 Finally, we disagree with the Commonwealth that merely because (1) the jury would have considered the same evidence with or without the unborn child's murder being submitted for the death penalty, (2) the jury found two aggravating circumstance in this regard, and (3) the judgment of sentence regarding the murder of the unborn child was correctly vacated, that the error discussed herein was essentially harmless. Under the mandates of cases such as *Gregg*, the General Assembly has built into our capital penalty legislation a mandatory review to ensure that "the sentence was [not] the product of passion, prejudice or any other arbitrary

9. It is necessary to note that the jury was so misinformed not just by the prosecuting attorney and defense counsel, but ultimately by the trial court itself. While we have no doubt that the error committed here was not intentional, our role as an appellate court is to correct errors and to ensure that every defendant has a fair and proper trial.

10. Indeed, from the commencement of trial, it appears that all of the attorneys and the trial court believed that the murder of Pennington's unborn child was a death-eligible offense. For example, *voir dire* in this case spanned five days. During individual questioning of prospective jurors during the second day, Attorney Alva continuously inquired into the potential members regarding their ability to consider the death penalty in a triple-murder case, in which two of the three victims were a mother and her unborn fetus. Only one of those prospective jurors questioned during the second day was accepted onto the panel (Juror # 10), and our review of the record indicates that the other principal and alternate jurors were not questioned in this regard. Nevertheless, we note that Appellant has not raised any allegation of error to this Court concerning whether the admission of Juror # 10 onto the panel constitutes reversible error due to Attorney Alva's questioning, and we therefore do not consider the issue.

factor." 42 Pa.C.S. § 9711(h)(3)(i). The arbitrariness required is much more than erroneous strategic or evidentiary decisions. *See Commonwealth v. Chambers,* 602 Pa. 224, 980 A.2d 35, 56 (2009) (refusing to review, under the guise of Section 9711's statutory review, a strategic decision made by defense counsel during closing arguments, even when such decision potentially violated *Caldwell*). Rather, it is reserved for the rare case, such as that presented here, where an error was made by all participants—defense counsel, prosecuting counsel, and the trial court. Simply put, there is present in this case the real potentiality that the jury returned a verdict of death because of the erroneous instruction of the trial court. *Accord Mills,* 486 U.S. at 377, 108 S.Ct. 1860. This error, under the unique facts of this case, rendered the procedure utilized in sentencing Appellant to death for the murder of Pennington questionable and uncertain, and thus is sufficient to warrant a vacatur of the sentence of death and a remand for a new penalty hearing.

## B. Remaining Penalty Phase Issues

While Appellant raised two additional issues pertaining to potential errors in the sentence of death for Pennington's murder, given our disposition above in Part III.A, we need not reach those issues.

## IV. Conclusion

Accordingly, we affirm Appellant's convictions. We vacate the judgment of sentence only as it relates to the imposition of the death penalty upon Appellant for the murder of Jennifer Pennington, and remand this case to the Montgomery County Court of Common Pleas for a new penalty hearing concerning that conviction. The judgment of sentence is affirmed in all other respects.

Jurisdiction relinquished.

Justices SAYLOR, TODD and McCAFFERY join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice EAKIN files a concurring opinion.

Chief Justice CASTILLE, concurring.

I join Mr. Justice Baer's thoughtful and comprehensive Majority Opinion in this capital direct appeal, with the exception of Part III A, as to which I concur in the result. This is a different case, to be sure; the Majority's discussion of the inexplicable error here is accurate; and the expression of deep concern is fully warranted and shared by myself. In terms of the ground for relief, however, I am not comfortable with adverting to general propositions in other capital cases from the U.S. Supreme Court addressing other unrelated specific problems, except to the extent they may provide general guidance. Premising the grant of relief upon such decisional law amounts to stating that High Court constitutional authority is either directly governing, or by logical extension, all reasonable jurists agree it would or should be governing.

This is not a case like some others passed upon by the High Court, where an authorized procedure of a state was employed and found to be unconstitutional. (Put another way, appellant does not point to any authority that says a state cannot authorize the death penalty for the first-degree murder of an unborn child). The underlying error here, rather, is one of Pennsylvania law. To eliminate the prospect of the death penalty for the murder of the unborn child, all the prosecutor had to do was read the plain language of the governing statute, 18 Pa.C.S. § 1102(a)(2), and all appellant's counsel had to do, once the prosecutor erred, was cite to the statute.

That error, if uncorrected, could give rise to a derivative constitutional claim, or claims, to be sure. But, at its essence, it was an error of state law, correctable through normal procedures. The correction did not occur here in advance of the trial due to a perfect storm of one-time ineffectiveness by otherwise capable counsel on both sides, and by a fine judge. The specific error was then corrected upon responsible post-trial motion of the prosecutor. What remains is a question of prejudice from the acknowledged error. As an analytical

matter, and to avoid unnecessary resort to broader and vaguer constitutional precepts, I view the question to be one governed, in the first instance, by harmless error principles.

When federal constitutional error is at issue in a direct appeal in a criminal case, the measure for prejudice is the harmless error rule deriving from *Chapman v. California*, 386 U.S. 18, 21, 87 S.Ct. 824, 826–27, 17 L.Ed.2d 705 (1967) (federal constitutional error cannot be found harmless unless appellate court is convinced beyond reasonable doubt that error was harmless; burden is on prosecution). In our seminal decision in *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978), however, this Court made clear that the same beyond a reasonable doubt measure should govern errors of state law, regardless of whether the error is of constitutional or non-constitutional magnitude. The Court went to some length to explain why the stringent measure should apply. *See id.* at 162–64.

The Commonwealth here does not specifically advert to the harmless error rule, much less does it argue the issue along the lines of the guidance in the *Story* opinion. Notably, however, in defending the denial of relief from the remaining death sentence, the Commonwealth does not argue that appellant waived the claim, or that the claim should be deferred to collateral review. Instead, its essential position is that there was error to be sure, but that the prejudice suffered by appellant was fully remedied by the belated vacatur of the death sentence for the murder of the unborn child.

In my judgment, given the inevitable spillover prejudice resulting from the Commonwealth's improperly being permitted to pursue a death sentence for the murder of the unborn child, the Commonwealth has not borne its burden of proving harmless error beyond a reasonable doubt. Indeed, given the standard, I do not even view the question as close. I come to this conclusion for many of the same reasons postulated by the Majority. My central difference is that I would squarely place the ground for decision upon the absence of harmless error, which is the usual manner by which we measure prejudice on direct appeal when an error is found or conceded. For the

same reason, I see no need to resort to the Court's statutory review for passion, prejudice and arbitrariness under 42 Pa. C.S. § 9711(h)(3)(i).

Justice EAKIN, concurring.

I join the majority. I write separately merely to reiterate that stating that capital cases are "subjected to the closest scrutiny," Majority Op., at 549, 83 A.3d at 163, should not be construed as affording a more complete level of scrutiny to capital cases. As I have previously expressed, relaxing requirements of proof for capital defendants or affording these cases greater scrutiny than is given others does not afford those others the equal protection of the laws. *See Commonwealth v. Brooks,* 576 Pa. 332, 839 A.2d 245, 255 (2003) (Eakin, J., concurring) ("[T]he constitution does not afford some lesser right to effective counsel on those charged with noncapital crimes. The right to counsel inures to the capital defendant, the felon, and the misdemeanant alike."). Defendants not convicted of capital murder do not get scrutiny that is less close, nor do they deserve "less exacting review" than capital defendants.