J-S28014-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CALVIN LORENZO PURDIE, JR. | : | |
| | : | |
| Appellant | : | No. 245 MDA 2022 |

Appeal from the Judgment of Sentence Entered January 27, 2022
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0004360-2019

BEFORE: OLSON, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY OLSON, J.: **FILED: NOVEMBER 8, 2022**

Appellant, Calvin Lorenzo Purdie, Jr., appeals from the January 27, 2022

judgment of sentence[1] imposing an aggregate sentence of 30 to 60 years'

---

[1] On January 10, 2022, the trial court sentenced Appellant to an aggregate term of 30 to 60 years' incarceration, with credit for time served, and ordered him to pay costs ($500.00) and restitution in the amount of $293,643.87, with certain distributions to each payee as specified within the sentencing order. *See* Sentencing Order, 1/18/22. On January 24, 2022, the Commonwealth filed a motion to modify Appellant's sentence, requesting reallocation of Appellant's restitution payments among the payees, while retaining the aggregate restorative sum of $293,643.87. On January 27, 2022, the trial court granted the Commonwealth's motion and entered an amended judgment of sentence that same day, imposing an aggregate sentence of 30 to 60 years' incarceration, with credit for time served, and ordering Appellant to pay costs ($500.00) and restitution in the amount of $293,643.87, with certain redistributed payments to each payee as modified therein. *See* Order of Court, 1/27/22.

When a trial court amends a judgment of sentence during the period in which it retains jurisdiction pursuant to 42 Pa.C.S.A. § 5505, the direct appeal lies

incarceration after Appellant was convicted in a jury trial of aggravated arson – person present inside property, arson endangering persons – danger of death or bodily injury, arson endangering persons – inhabited building or structure, and third-degree murder.[2]  We affirm.

The trial court summarized the factual history as follows:

> On May 23, 2019, Sergeant Anthony C. Clements [("Sergeant Clements")] of the Derry Township Police Department had just begun his shift at 6:00[ a.m.,] when he received a call for a structure fire at [a residence located on] West Chocolate Avenue in Hershey, Pennsylvania.  Sergeant Clements was the first to arrive on scene and notified Dauphin County dispatch that there was smoke coming from the residence.  He went to the side entrance, near the kitchen, and observed a black male holding a child and a black female on the [tele]phone.  The female was screaming [into the telephone] that her mother was still inside the residence.

_____

from the amended judgment of sentence.  **See Commonwealth v. Garzone**, 993 A.2d 1245, 1254 n.6 (Pa. Super. 2010), *aff'd*, 34 A.3d 67 (Pa. 2012); **see also** 42 Pa.C.S.A. § 5505 (stating, "[e]xcept as otherwise provided or prescribed by law, a court upon notice to the parties may modify or rescind any order within 30 days after its entry, notwithstanding the prior termination of any term of court, if no appeal from such order has been taken or allowed").  Therefore, Appellant's appeal properly lies from the January 27, 2022 amended judgment of sentence.  The caption has been corrected accordingly.

[2] 18 Pa.C.S.A. §§ 3301(a.1)(1), 3301(a)(1)(i), 3301(a)(1)(ii), and 2502(c), respectively.  Appellant was sentenced to 20 to 40 years' incarceration for his conviction of third-degree murder.  In addition, Appellant was sentenced to 10 to 20 years' incarceration for his conviction of aggravated arson – person present inside property, with this sentence to run consecutively to the sentence imposed for his third-degree murder conviction.  For sentencing purposes, Appellant's convictions for arson endangering persons – danger of death or bodily injury and arson endangering persons – inhabited building or structure merged with his conviction for aggravated arson – person present inside property.

Sergeant Clements entered the residence through the kitchen and noted a heavy amount of smoke and could see flames coming from the room straight back from the kitchen, which was later identified as the victim's bedroom. [Sergeant Clements] almost made it to the bathroom door when he was overcome with smoke and had to retreat outside. Sergeant Clements attempted to enter the residence a second [] time with a fire extinguisher, hoping to extinguish the flames. He did not make it through the kitchen before he was overcome with smoke and heat. He dropped the fire extinguisher and crawled back outside.

Keith Swank [("Swank")] is a volunteer firefighter for Hummelstown[, Pennsylvania]. He was on his way to work on May 23, 2019, when [he was alerted] that there was a structure fire with a possible entrapment. Since he was about a block away [from the fire scene,] Swank drove to [the residence on] West Chocolate Avenue and arrived shortly after [Sergeant] Clements. Upon arriving at the scene, [] Swank entered [the residence] through the kitchen and began a clockwise sweep through the residence. At that time, the smoke was hazy, and [] Swank was still able to stand[ upright].

While doing his sweep [of the residence, Swank] saw the door to the [victim's] bedroom was [partially open] and could see light flickering. [] Swank dropped to his knees and pushed the [bedroom] door open and saw the fire on the bed. Someone handed him a fire extinguisher[,] and he started to look for the victim. However, the smoke and fire were getting too bad, and he was forced to crawl back outside [the residence. ]Swank and Sergeant Clements made an attempt together - the smoke was "banked all but to the floor" and they were no longer able to stand [upright. ]Swank made it about halfway to the [victim's] bed but had to retreat outside for fresh air. [] Swank and Sergeant Clements started to go back in, but it was too dangerous as the fire was already rolling over[] their heads. Sergeant Clements wanted to make one final attempt, but did not make it through the kitchen before he was overcome with smoke and heat[. He] does not remember how he got out [of the residence. ]Swank grabbed Sergeant Clements by his vest and [dragged] him out of the burning residence.

Sergeant Clements and [] Swank were transported to [a medical center] for treatment. Sergeant Clements felt a burning in his chest from the smoke inhalation. He was given oxygen at the scene, as well as [at] the [medical center,] and was monitored

until his oxygen levels returned to normal. Sergeant Clements returned to desk duty for the remainder of his shift[ that same day and] had a cough for a couple of days after the fire. [] Swank could not breathe from the smoke inhalation and did not go back to work for about a day after being released. He had trouble breathing and his chest hurt for about two [] days after the fire.

After the fire was completely extinguished, law enforcement officers discovered a charred body in the bedroom where the fire started[.]

> Right there at the foot of the bed she was laying prone on her back. Her right hand was bent up at about a 45-degree angle towards her chest. Her left arm was laying limp out to its side underneath the desk and [] her legs and knees were bent up almost like she was sitting down.

The most significant charring was [on the bedroom ceiling] directly above where the body was found[.]

Dr. Wayne Ross [("Dr. Ross")], a forensic pathologist employed [by] the Dauphin County Coroner's Office[,] performed an autopsy on the victim on May 28, 2019. He described the body as completely charred, with the heaviest amount of charring at her upper face, neck[,] and chest area. The victim's right hand was completely burned. However, the left [hand] was not, and Dr. Ross observed all five [] fingernails were still present and the left pinky nail was broken. The victim's fingernails from her left hand were collected and preserved for analysis.

Dr. Ross testified that the cause of death was strangulation, and the manner of death was homicide. He testified that the victim was dead before the fire began as there was no significant carbon monoxide in the victim's body. Dr. Ross further testified that the victim was alive when she was strangled because there was evidence of bleeding around the hyoid bone, as well as the thyroid cartilage, and there was a hemorrhage in the back of her neck. The evidence is consistent with being strangled while on her back. There was no evidence of a sexual assault.

Pennsylvania State Trooper Jonathan Wolfe [("Trooper Wolfe")] is a deputy fire marshal and was assigned to investigate the fire in this case. Trooper Wolfe opined that the fire started in the victim's bedroom, within two [] feet of her head. Through his investigation, Trooper Wolfe ruled out the radiator and electrical outlets as [causes] of the fire. He opined that the fire had a single

source of origin and accelerants were not used. Trooper Wolfe concluded that the cause of the fire was undetermined.

Detective Robert Matthew Dotts [("Detective Dotts"), a detective] with the Derry Township Police Department[,] arrived on scene with Detective [David E.] Rode. Upon arriving at the rear of the residence, Detective Dotts observed [Appellant] talking to other people at the scene. Detective Dotts testified that [Appellant] appeared more collected and approachable than some of the other individuals present. Unbeknownst to Detective Dotts, the camera system in his patrol vehicle [] recorded the entire scene at the back of the residence. The recording was played at trial.

At approximately 8:02 [a.m.], the recording shows [Appellant] with the victim's daughter, []who is holding [her daughter, fathered by Appellant.] It appeared that [Appellant] and [the victim's daughter] were having a discussion[,] and she rubbed [Appellant's] face. From where he was standing, Detective Dotts could hear [Appellant's] and [the victim's daughter's] conversation. Detective Dotts testified that he overheard [the victim's daughter] ask [Appellant], "what did you do, I need to know" and [Appellant] respond, "are you serious?" [Detective Dotts] further testified that he heard [the victim's daughter] say, "I'm placing this on someone." While speaking with [Appellant] later, Detective Dotts observed fresh scratch marks on [Appellant's] face and neck.

[The victim's daughter] testified that she was with [Appellant] leading up to the fire. She met him at his mother's house[ on the evening prior to the fire,] and [they] went to a bar[.] They were at [the bar] for a few hours and then walked back to [Appellant's] mother's house. [The victim's daughter] texted her mother, the victim, for a ride home, but she was unavailable. As a result, [Appellant, the victim's daughter,] and their daughter took a [transportation service] back to [the victim's residence] sometime between 11:00 [p.m.] on May 22, 2019, and 12:00 [a.m.] on May 23, 2019. The next thing [the victim's daughter] remembered is being woken up by [Appellant] who was yelling at her about finding condoms in her bedroom. [The victim's daughter] told [Appellant the condoms belonged to the victim] and [then] went back to sleep.

The next time [the victim's daughter] woke up it was daylight and [Appellant] was not in the room. She then fell back asleep and was woken up again by [Appellant] yelling to get up because [the

victim's] bedroom was on fire. [The victim's daughter] ran to [the victims' bedroom] and could see flames through [the open portion of the bedroom doorway]. When she opened [the bedroom door] all the way, she could see the whole back side of the bedroom was on fire. [The victim's daughter] closed the door, but not all the way, ran and got dressed, grabbed her [tele]phone while [Appellant] grabbed their daughter, and they went outside to safety. Initially, [the victim's daughter] believed [the victim] was at work because that was her normal work schedule.

While [the victim's daughter] was calling 911 [emergency services], she noticed [the victim's] car was still parked in the lot behind [] the residence. Neither she nor [Appellant] attempted to reenter the [residence]. After emergency personnel arrived, [the victim's daughter] and [Appellant] were talking when she noticed fresh scratch marks on [Appellant's] face and neck that were not there the night before. She questioned [Appellant] about where he got the scratches and told him she was going to find out who did it. [The victim's daughter] denied that she caused the scratch marks on [Appellant].

Jennifer Marchand [("Marchand")] is a forensic scientist employed by the Pennsylvania State Police at the Harrisburg Regional Laboratory. She received the following evidence for analysis: left hand fingernail clippings from the victim; a known blood sample from the victim; nasal, vaginal, anal[,] and oral swabs from the victim; and a buccal sample from Walter Gaines [("Gaines")]. The nasal swab was not analyzed because the oral swabs provide[d] a better sample than [the] nasal swabs. There were no spermatozoa on the vaginal, anal, and oral swabs. However, the anal and oral swabs were presumptive for blood[. T]herefore, [Marchand] prepared the swabs for further [deoxyribonucleic acid ("DNA")] testing. [] Marchand did not test the fingernail clippings for spermatozoa or blood and merely prepared them for DNA analysis.

Timothy Gavel [("Gavel")] is a forensic scientist employed by the Pennsylvania State Police DNA laboratory. [] Gavel received the following evidence in this matter for DNA analysis: [a] known blood sample from the victim; a buccal swab from [] Gaines; a buccal swab from [Appellant]; the victim's fingernail clippings; and the vaginal, anal[,] and oral swabs of the victim. [] Gavel determined that the vaginal, anal[,] and oral swabs did not have enough male DNA detected to proceed with further analysis.

[] Gavel swabbed the underside of the fingernail clippings to obtain DNA and determined that there was a mixture of two [] individuals' DNA. Most of the mixture was a match to the victim['s DNA], which was expected. [] Gavel compared the DNA to the buccal swab from [] Gaines and excluded him as a contributor. When [the DNA was] compared to the buccal swab from [Appellant], he could not be excluded as a potential contributor. [] Gavel then conducted a Y chromosome [short tandem repeat ("STR")] DNA test. He explained that in situations where there is a large amount of female DNA and only a small amount of male DNA, the STR [DNA] test allowed him to isolate the male components and provide a Y chromosome DNA profile for the fingernail clippings. [] Gavel testified that the Y chromosome DNA profile was a match at all areas [of] the buccal swab [obtained] from [Appellant].

Dr. Christian G. Westring [("Dr. Westring")] is the Director for the Center for Crime and Forensics at Purdue University and the owner and executive director of Gustav & Sons, LLC. Dr. Westring was asked by the Commonwealth to review the Pennsylvania State Police analysis and conclusions regarding the victim's fingernail clippings. He agreed that the DNA sample from underneath the fingernails contained a mixture of female and male DNA. The victim's DNA was identified as the female contributor and [Appellant's] DNA was consistent with the male contributor. Dr. Westring confirmed that [] Gaines was excluded as a possible contributor. He further explained that DNA can be transferred through a scratch on the skin.

The Commonwealth introduced additional evidence that showed [] Gaines was at his then-girlfriend's residence [] at the time of the homicide and subsequent fire. Similarly, the Commonwealth introduced testimony from [] the general factory business leader at the Reese's plant in Hershey, Pennsylvania[, who testified that the employment records indicate [a co-worker of the victim ("Co-Worker 1")] was at work from 10:26 [p.m.] on May 22, 2019, until 6:30 [a.m.] on May 23, 2019. [The general factory business leader] further testified that the employment records

indicate [a second co-worker of the victim ("Co-Worker 2")] was at work from 2:42 [a.m.] to 10:35 [a.m.[3]]

Trial Court Opinion, 4/20/22, at 3-10 (record citations, footnotes, and extraneous capitalization omitted).

On November 12, 2021, a jury convicted Appellant of aggravated arson – person present inside property, arson endangering persons – danger of death or bodily injury, arson endangering persons – inhabited building or structure, and third-degree murder.[4] As discussed *supra*, on January 27, 2022, Appellant was sentenced to an aggregate sentence of 30 to 60 years' incarceration, with credit for time served, and was ordered to pay costs in the amount of $500.00 and restitution in the amount of $293,643.87. Appellant did not file a post-sentence motion. This appeal followed.[5]

Appellant raises the following issues for our review:

[1.] Whether the trial court erred in denying [Appellant's introduction] of a protection from abuse [("PFA")] order's contents, specifically the mental state of the [victim] regarding her safety from [] Gaines, [into evidence] when the statement provided evidence that she feared for her safety, it was not offered for the truth of the matter asserted, and was central to a third[ person] guilt defense?

_____

[3] "Several individuals involved in this case worked at the Reese's plant – the victim, [the victim's daughter,] Gaines, [Co-Worker 1, and Co-Worker 2]." Trial Court Opinion, 4/20/22, at 10 n.3.

[4] Appellant was found not guilty of first-degree murder, 18 Pa.C.S.A. § 2502(a). Appellant's first jury trial, which occurred in April 2021, resulted in a mistrial because the jury was unable to render a verdict.

[5] Both Appellant and the trial court complied with Pa.R.A.P. 1925.

[2.] Whether there was sufficient evidence to sustain a conviction for third-degree murder, when the evidence, even in the light most favorable to the Commonwealth, requires too many factual and logical leaps to prove [Appellant] committed the homicide when the evidence was limited to his mere presence at the [victim's residence], scratch marks with unknown origin, and DNA with no manner of determining its source[?]

[3.] Whether there was sufficient evidence to sustain a conviction for arson, when the evidence, even in the light most favorable to the Commonwealth, requires too many factual and logical leaps to prove [Appellant] committed [third-degree] murder [] and arson, when the evidence was limited to his mere presence at the [victim's residence], scratch marks with unknown origin, and DNA with no manner of determining its source[?]

Appellant's Brief at 6-7 (extraneous capitalization omitted).

In his first issue, Appellant argues that the trial court erred in refusing to admit a PFA petition the victim filed against Gaines. Appellant's Brief at 24-37. Appellant offered the petition as evidence to show that the victim feared Gaines, a third party Appellant claims may have committed the offenses for which Appellant was charged. *Id.* Appellant contends that the PFA petition was admissible to establish third person guilt because it was relevant, did not constitute hearsay, and its probative value was not outweighed by a danger of, *inter alia*, confusing the issues for the jury. *Id.* In particular, Appellant asserts that the PFA petition did not constitute hearsay because it was offered not for the truth of the matter asserted therein (that Gaines stated he would harm, or find someone to harm, the victim) but, rather, to show that the victim feared Gaines would harm her. *Id.* at 26, 28 (arguing that, the statement was not offered for the truth of the matter

- 9 -

asserted[,] *i.e.*, the truth that [] Gaines said those things[, r]ather[,] it was offered solely for the [jury] to know [the victim] feared him").

Our standard of review of questions concerning the admissibility of evidence is well-settled.

> [T]he admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion. Our standard of review of a challenge to an evidentiary ruling is therefore limited. Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias[,] or ill[-]will.

***Commonwealth v. Herring***, 271 A.3d 911, 918 (Pa. Super. 2022) (original brackets omitted).

"Third person guilt evidence" is defined as "evidence of a third person's crimes, wrongs[,] or other acts ('third person guilt') offered by a criminal defendant in an effort to raise a reasonable doubt that he[, or she,] was not the perpetrator of the crime charged." ***Commonwealth v. Yale***, 249 A.3d 1001, 1004 (Pa. 2021). "[Such evidence] is admissible if it is relevant, not otherwise excludable, and surmounts the disqualifying considerations of Pa.R.E. 403 [(probative value outweighed by, *inter alia*, unfair prejudice)]." ***Id.*** at 1023 (stating that, the admissibility of third person guilt evidence is governed by Pennsylvania Rules of Evidence 401 to 403).

Recognizing the three-prong test set forth in ***Yale***, ***supra***, as governing the admissibility of third person guilt evidence, the trial court, in the case *sub*

*judice*, excluded the PFA petition on grounds that it constituted hearsay within hearsay, explaining,

> The issue here is whether the PFA petition is otherwise excludable, *i.e.*, hearsay without an exception. Hearsay is an out-of-court statement made by a declarant that a party seeks to admit for the truth of the matter asserted. Pa.R.E. 801 (definitions). Hearsay is generally inadmissible unless there is an exception. Pa.R.E. 802.
>
> Here, the victim's allegations within the PFA petition are clearly hearsay within hearsay, which requires an exception for each. They are out-of-court statements made by a declarant to prove the truth of the matter asserted, *i.e.*, that the victim was afraid of [] Gaines. Appellant failed to articulate a valid exception for either the PFA petition or the allegations within the petition. Rather, he argued that the allegations within the PFA petition are statements that were signed and verified by the victim; therefore, it is not hearsay. It appears Appellant may be combining two [] separate issues - evidence of the existence of a PFA petition versus the allegations within the PFA petition. . . . However, the allegations within the PFA petition are also hearsay without an exception.
>
> Additionally, counsel for Appellant elicited the crux of the victim's allegations against [] Gaines during direct examination[.]

Trial Court Opinion, 4/20/22, at 17.

We begin our review of the trial court's ruling with the relevance prong of the ***Yale*** test. "The United States Supreme Court has long recognized that a defendant has the right to present evidence and that in defense, evidence of a third person's guilt is relevant." ***Yale***, 249 A.3d at 1012 (stating, "[f]ew rights are more fundamental than that of an accused to present witnesses of his own defense" (citation and original quotation marks omitted)). Our Supreme Court "has also historically recognized a defendant's right to present evidence that someone else committed the crime of which he is accused." ***Id.***

- 11 -

at 1014 (stating, "an accused should be allowed to prove a fact which would logically produce a doubt of his guilt in the mind of the jury" (citation and original quotation marks omitted)). Conversely, a "defendant has no duty to present evidence and may instead rely on the presumption of innocence and the Commonwealth's burden of proof." *Id.* at 1018 (citation and original quotation marks omitted). Evidence that a third person, such as Gaines, may have committed the offenses of which Appellant was charged was relevant at Appellant's criminal trial. *See id.* at 1014.

Admissibility under the second prong of the *Yale* test requires that the third person guilt evidence must not be otherwise excludible. *Id*. at 1023. Pennsylvania Rule of Evidence 802 states, "[h]earsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802. Hearsay is defined as a statement "the declarant does not make while testifying at the current trial or hearing" that "a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c)(1) and (2).

> An out-of-court declaration containing another out-of-court declaration is double hearsay. In order for double hearsay to be admissible, the reliability and trustworthiness of each declarant must be independently established. This requirement is satisfied when each statement comes within an exception to the hearsay rule.

*Commonwealth v. Laich*, 777 A.2d 1057, 1060 (Pa. 2001). By comparison, if an out-of-court statement is not offered for the truth of the matter asserted, the statement is not hearsay and can be admitted for a non-truth purpose.

- 12 -

*Commonwealth v. Fitzpatrick*, 255 A.3d 452, 479 (Pa. 2021). Thus, a trial court's initial inquiry involves, in part, identification of the purpose for which the evidence is propounded.

In the case *sub judice*, the trial court excluded the PFA petition because it concluded that both the PFA petition and the allegations contained therein constituted double hearsay for which Appellant did not offer valid exceptions. N.T., 11/12/21, at 629-630; **see also** Trial Court Opinion, 4/20/22, at 17.[6] Upon review, we concur with the trial court that the PFA petition and the allegations contained therein constituted hearsay within hearsay because the out-of-court statements were offered for the truth of the matter asserted, namely that Gaines threatened and attempted to harm the victim previously.[7] To support his third person guilt theory, Appellant sought to introduce the PFA petition and the allegations contained therein as evidence that Gaines previously threatened to harm and attempted to harm the victim to create doubt in the eyes of the jury as to Appellant's culpability. **See** Appellant's

---

[6] The notes of testimony for Appellant's trial, which took place on November 8, 2021, through November 10, 2021, and on November 12, 2021, were compiled as a single, successively-paginated transcript. For purposes of citing the notes of testimony, we refer to the date the testimony was provided and the page number of the transcript.

[7] Although the PFA petition is not part of the certified record, Gaines testified at trial that the PFA petition contained an allegation by the victim that, on May 14, 2018, Gaines "woke up and lunged at [the victim] with a hanger from the bed." N.T., 11/12/21, at 676-677. Appellant further asserts that the PFA petition contained an averment by the victim that Gaines told her "I will, or I will get[] someone to[,] hurt you." Appellant's Brief at 26.

Brief at 32 (stating, the PFA petition and the allegations contained therein "makes [Appellant's] culpability less probable, as it provides doubt as to why he would commit the homicide").[8]  The PFA petition and the allegations contained therein were not offered solely for the purpose of demonstrating that the victim feared Gaines, as Appellant argued at trial.[9]  Rather, Appellant sought to suggest, through introduction of the PFA petition, that a third party, namely Gaines, was responsible for the victim's death based upon the truthfulness of the alleged threats and attempted harm contained within the PFA petition.  Both the PFA petition and the victim's allegations contained

---

[8] Appellant's characterization of the PFA allegations – providing "doubt as to **why** [Appellant] would commit the homicide" – is misplaced.  The PFA relates to a matter involving the victim and Gaines, with no mention of or reference to Appellant.  The PFA and the allegations contained therein do not explain **why** Appellant did or did not commit the homicide.  Rather, the PFA and the allegations contained therein provide doubt **whether** Appellant did or did not commit the homicide by suggesting third person guilt.

[9] "In the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of imminent serious bodily injury[.]" **E.K. v. J.R.A.**, 237 A.3d 509, 519 (Pa. Super. 2020) (citation and original quotation marks omitted).  To obtain relief, a victim must prove the allegations contained within the PFA petition by a preponderance of the evidence.  23 Pa.C.S.A. § 6107(a); **see also E.K.**, 237 A.3d at 519.

Implicit in Appellant's "fear" argument, in the case *sub judice*, is the assertion that the allegations of what Gaines did or said to the victim were truthful thereby giving rise to the victim's fear of Gaines.  While it may be inferred from the filing of a PFA petition that a victim fears the person against whom the PFA petition is filed, a victim may also file a PFA petition because the victim is annoyed with or felt harassed by the person against whom the PFA is filed or, even, for malicious reasons.  The rationale behind the filing of a PFA petition cannot be ascertained simply by evidence that a petition was filed.

therein were out-of-court statements that Appellant offered for the truth of the asserted matter, *i.e.*, Gaines' threats and his previous attempt to harm the victim. Thus, the petition and the allegations contained therein constituted double hearsay, and Appellant needed to demonstrate an exception to the rule against hearsay for both the PFA petition and the allegations contained therein. Because Appellant did not make such a showing, the trial court's evidentiary ruling must be affirmed.

At trial, Appellant asserted that the PFA petition and the victim's allegations against Gaines contained in the PFA petition fell within the state of mind exception to the rule against hearsay. N.T., 11/12/21, at 625. Pennsylvania Rule of Evidence 803(3) sets forth the present state of mind exception as follows,

### Rule 803.  Exceptions to the Rule Against Hearsay - Regardless of Whether the Declarant is Available as a Witness

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

. . .

**(3) Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Pa.R.E. 803(3). "Rule 803(3) permits only statements establishing the declarant's state of mind, but no one else's[, and] forbids the admission of a

statement of memory or belief to prove the fact remembered or believed unless it relates to a will." ***Fitzpatrick***, 255 A.3d at 481 (citation and original quotation marks omitted). State of mind statements "are normally excepted out of the hearsay rule, because the reliability of such statements are established by the statement being made contemporaneous with a provoking event." ***Commonwealth v. Murray***, 83 A.3d 137, 157 (Pa. 2013). The state of mind exception does not serve "as a mechanism to circumvent the rules of evidence, repurposing statement of mind evidence into a 'conduit' to obtain admission of otherwise inadmissible facts." ***Fitzpatrick***, 255 A.3d at 481.

As discussed *supra*, Appellant offered the PFA petition and the allegations contained therein as evidence that Gaines did or said what the victim alleged to support his theory of third person guilt. In this instant, the PFA petition and the allegations contained therein were being offered for the truth of the matter asserted, namely that Gaines threatened and attempted to harm the victim previously (a fact-bound component). To qualify for the state of mind exception, the out-of-court statement must relate to the declarant's state of mind and **may not be a statement of memory or belief to prove the fact remembered or believed**. Pa.R.E. 803(3); ***see also Fitzpatrick***, 255 A.3d at 481-482. The PFA petition and the allegations contained therein are a statement of the victim's memory of the things Gaines said to her or the harm that he threated or attempted to impose upon her. While the victim's involvement with Gaines may have resulted in the victim experiencing an emotional state of fear, the PFA petition and the allegations

contained therein are, nonetheless, substantive facts being used to prove that Gaines previously threatened and attempted to harm the victim. Used in this way to support Appellant's third person guilty theory, we concur with the trial court, and the record supports, that the PFA petition and the allegations contained therein are hearsay statements without exception. Consequently, we discern no abuse of discretion in the trial court's evidentiary ruling regarding the admissibility of the PFA petition and the allegations contained therein.[10]

_____

[10] Appellant also asserted that the PFA petition and the allegations contained therein qualified for the excited utterance exception or were admissible because the PFA petition was signed and verified by the victim. N.T., 11/12/21, at 623, 625-626.

An excited utterance by a declarant, regardless of whether the declarant is available as a witness at trial, is not excluded by the rule against hearsay when the out-of-court statement relates "to a startling event or condition" and is "made while the declarant is under the stress of excitement that it caused." Pa.R.E. 803(2).

Here, the victim's allegations contained within the PFA petition were made some time after the events that led to the allegations and upon reflection by the victim. Therefore, the excited utterance exception to the rule against hearsay does not apply to the allegations in the PFA petition. **Murray**, 83 A.3d at 157 (describing an excited utterance as a "spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person has just participated in or closely witnessed, and made in reference to some phase of that occurrence which he[, or she,] perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his[, or her,] reflective faculties"). Insomuch as Appellant argued that the allegations contained in the PFA petition were admissible under the excited utterance exception, Appellant's assertion is without merit.

Appellant's second and third issues collectively challenge the sufficiency of the evidence to support to his aforementioned convictions. Appellant's Brief at 6-7, 37-46. Our standard of review of sufficiency of the evidence claims is well-settled.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [this] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof or proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying [this] test, the entire record must be evaluated and all the evidence actually received must be considered. Finally, the trier[-]of[-]fact while

---

Regarding the assertion that the PFA petition was signed and verified by the victim and, therefore, admissible, Pennsylvania Rule of Evidence 803.1(1) sets forth an exception to the rule against hearsay by which a signed and adopted prior written statement by a declarant is admissible **if the declarant's prior statement is inconsistent with the declarant's testimony at trial**. Pa.R.E. 803.1(1) (stating that, a prior statement, which is in writing and signed by and adopted by the declarant, is not excluded by the rule against hearsay if the declarant testifies at trial and is subject to cross-examination about the prior statement and the prior statement is inconsistent with the declarant's testimony at trial). In the case *sub judice*, the victim, the declarant of the out-of-court statement (the PFA petition) did not testify at trial because she is deceased. As such, her PFA petition could not be admitted as a signed and adopted prior written statement by the victim pursuant to Rule 803.1(1).

passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Pappas*, 845 A.2d 829, 835-836 (Pa. Super. 2004) (citation omitted), *appeal denied*, 862 A.2d 1254 (Pa. 2004).

This standard [of review] is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Although a conviction must be based on more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty.

*Commonwealth v. Patterson*, 180 A.3d 1217, 1229-1230 (Pa. Super. 2018) (citation and quotation marks omitted), *appeal denied*, 229 A.3d 562 (Pa. 2020).

Simply stated, "[t]o establish the offense of third-degree murder, the Commonwealth must prove the killing of an individual with malice." *Commonwealth v. Jones*, 271 A.3d 452, 458 (Pa. Super. 2021), *appeal denied*, 2022 WL 2913856 (Pa. filed July 25, 2022) (slip copy). Section 3301 of the Crimes Code defines arson in relevant part as follows:

### § 3301. Arson and related offenses

**(a) Arson endangering persons.**--

(1) A person commits a felony of the first degree if he intentionally starts a fire or causes an explosion, or if he aids, counsels, pays or agrees to pay another to cause a fire or explosion, whether on his own property or on that of another, and if:

(i) he thereby recklessly places another person in danger of death or bodily injury, including but not limited to a firefighter, police officer or other person actively engaged in fighting the fire; or

- 19 -

(ii) he commits the act with the purpose of destroying or damaging an inhabited building or occupied structure of another.

. . .

**(a.1) Aggravated arson.**--

(1) A person commits a felony of the first degree if he intentionally starts a fire or causes an explosion, or if he aids, counsels, pays or agrees to pay another to cause a fire or explosion, whether on his own property or on that of another, and if:

(i) he thereby attempts to cause, or intentionally, knowingly or recklessly causes bodily injury to another person, including, but not limited to, a firefighter, police officer or other person actively engaged in fighting the fire; or

(ii) he commits an offense under this section which is graded as a felony when a person is present inside the property at the time of the offense.

18 Pa.C.S.A. § 3301(a)(1)(i and ii) and (a.1)(1)(i and ii).

Rather than challenge the sufficiency of the evidence to support any of the applicable elements of the aforementioned offenses, Appellant contends that the evidence was insufficient to prove he was the perpetrator of these offenses. Appellant's Brief at 42 (stating, "the evidence was insufficient to show [Appellant's] participation in the murder [and] arson [offenses] because the evidence is either speculative or innocuous").

A review of the record demonstrates that on the evening prior to the incident, Appellant, the victim's daughter, and the victim's granddaughter returned to the victim's home between 11:00 p.m. and 12:00 a.m. N.T., 11/10/21, at 507. These three individuals remained at the victim's residence until they exited the residence the following morning due to the fire. *Id.* at

507-510. The victim's daughter testified that, upon exiting the residence due to the fire, she noticed that Appellant had fresh scratches on his face, neck, and arm that she had not observed the prior evening. *Id.* at 512. Detective Dotts, upon arriving at the scene of the incident, similarly observed Appellant with fresh scratches on his face and his left arm above the elbow. N.T., 11/9/21, at 225.

Mr. Gavel, an expert qualified as a forensic scientist in the field of DNA profiling and testing, testified that a DNA sample obtained from the fingernail clippings on the victim's left hand demonstrated the presence of both the victim's DNA and DNA from a male individual. *Id.* at 376, 384, 394 (stating, "from the left hand fingernail clippings[,] I [(Mr. Gavel)] obtained what's considered a DNA mixture profile[, which] means that there's more than one person's DNA present on that particular item"). Comparing DNA samples obtained from Gaines and Appellant with the DNA mixture profile found on the victim's fingernails, Mr. Gavel excluded Gaines as a contributor to the DNA mixture. *Id.* at 385-386. Appellant was unable to be excluded as a contributor to the DNA mixture using the same analysis and comparison methods.[11] *Id.* at 387. Mr. Gavel then performed a Y chromosome STR DNA test to isolate the DNA of the male contributor. *Id.* at 388-389. This analysis,

_____

[11] Mr. Gavel explained that his initial analysis of the DNA evidence involved a comparison of 24 locations on the DNA to determine whether the DNA obtained from the evidence sample matched the DNA sample obtained from Gaines or Appellant. N.T., 11/9/21, at 378, 386.

again, confirmed that Appellant could not be excluded as a contributor to the DNA mixture obtained from the victim's fingernails. *Id.* at 390. Mr. Gavel summarized his findings as follows:

> I performed a likelihood ratio for [the DNA mixture profile] and the comparison was how much more likely is it that it's [the victim's] and [Appellant's] DNA versus [the victim's] and some unknown person's DNA and it's 14 trillion times more likely in the Caucasian population, 2.8 trillion times more likely in the African American population[,] and 3.4 trillion times more likely in the Hispanic population that it's [the victim's] and [Appellant's] DNA as opposed to [the victim's] and some unknown person's DNA.

*Id.* at 399-400.[12] Dr. Westring, an expert in the fields of molecular biology, forensic genetics, and forensic biology, confirmed Mr. Gavel's findings regarding the DNA sample. N.T., 11/10/21, at 413, 421-426. Specifically, Dr. Westring stated that the male DNA sample collected from the victim's fingernails was consistent with the DNA sample obtained from Appellant. *Id.* at 425. Dr. Westring also confirmed that Gaines was excluded as a contributor of the male DNA collected from the victim's fingernails. *Id.* at 426.

Trooper Wolfe, a deputy fire marshal with the Pennsylvania State Police and an expert in cause and origin of fire, upon analyzing the crime scene, concluded that the cause of the fire was undetermined. N.T., 11/8/21, at 183, 189. In so concluding, Trooper Wolfe determined that the fire was not caused

---

[12] Appellant is an African American male. Therefore, according to Mr. Gavel's findings, it was 2.8 trillion times more likely that Appellant was the contributor of the male DNA collected from the victim's fingernails.

by the radiator, the electrical wiring, or a lit cigarette, and there was no indication that an accelerate was used to start the fire. *Id.* at 185-189. Trooper Wolfe further determined that there was a single point of origin for the fire approximately two feet from the victim's head and on the mattress of the bed where the victim was found. *Id.* at 187-188, 195. The victim's death was ruled a homicide because the autopsy revealed the cause of death was strangulation, and that the victim was deceased prior to being subjected to the effects of the fire. *Id.* at 93, 132.

In viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, there was sufficient evidence to enable the jury, as fact-finder, to find beyond a reasonable doubt that Appellant was the perpetrator of the aforementioned offenses. Specifically, Appellant was present in the victim's residence prior to the incident, Appellant had scratches on his face, arm, and neck on the morning following the incident that were not present the evening prior, and it was 2.8 trillion times more likely that Appellant's DNA was found underneath the victim's fingernails. Therefore, Appellant's claims as they relate to the sufficiency of the evidence are without merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/8/2022