J-A08038-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| DOMINIQUE LEONARD SMITH | : | |
| Appellant | : | No. 1560 EDA 2025 |

Appeal from the Judgment of Sentence Entered March 19, 2025
In the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0000596-2024

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and KING, J.

MEMORANDUM BY PANELLA, P.J.E.: **FILED MAY 22, 2026**

Dominique Leonard Smith appeals from the amended judgment of sentence entered in the Monroe County Court of Common Pleas on March 19, 2025. On appeal, Smith challenges the admission of a 911 phone call and body worn camera footage ("BWC") during trial, as hearsay and a violation of his constitutional confrontation rights. After careful review, we affirm.

On March 13, 2024, Smith was charged by criminal complaint with Count 1—aggravated assault, Count 2—strangulation, Count 3—simple assault, caused bodily injury, Count 4—simple assault, fear of serious bodily injury, Count 5—recklessly endangering another person ("REAP"), and Count

6−harassment by physical contact.[1] These charges stemmed from the reported assault of Smith's girlfriend, Jessica Garcia. The Commonwealth later filed a criminal information, adding a Count 7−terroristic threats.[2]

The trial court summarized the facts and procedural history of this matter, considered in a light most favorable to the Commonwealth, the verdict winner, as follows:

> On March 13, 2024, Stroud Area Regional Police (SARP) Officer Terry Eilber was directed to respond to a 911 domestic violence call about an incident that occurred at 2 Spring Lane, East Stroudsburg, PA. The call was made at approximately 12:35 p.m. by the victim, Jessica Garcia, who stated that she was driving to the SARP East Stroudsburg Police Headquarters after her boyfriend, Dominique Smith, assaulted her. She stated on the call that Smith had "just beat the shit out of me[,]" "my face was all f*ed up" and he was "outside throwing all my shit in a dumpster."
>
> Officer Eilber arrived at the SARP headquarters. As he approached the police department building, his bodycam video recorder showed 12:45 PM. The bodycam footage showed [] Garcia, her friend [Aaliyah] Garone and a small child come out of the police department building. She met [Officer] Eilber outside the front door of the building. She appeared to be upset and crying:
>
> > [] Garcia: Me and my boyfriend got into a fight this morning. (choking in tears). And he choked me right in front of my baby ... And then he kept going on as I tried to pack my stuff and he then beat me again and at this point I was outside ... She seen it (gesturing toward a woman nearby, later identified as [] Garone).
> >
> > Officer Eilber: and he was hitting you when you were ...

---

[1] 18 Pa.C.S.A. 2702(a)(1), 18 Pa.C.S.A. 2718, 18 Pa.C.S.A. 2701(a)(1), 18 Pa.C.S.A. 2701(a)(3), 18 Pa.C.S.A. 2705, 18 Pa.C.S.A. 2709(a)(1), respectively.

[2] 18 Pa.C.S.A 2706(a)(1).

[] Garcia: Multiple times ... (Choking). I'm pregnant ... like 10 weeks pregnant (Cough).

Officer Eilber: Did you lose any consciousness or anything?

[] Garcia: No. And when he punched me, he punched me ... hit the wall though, and I hit the back of my head. I wish he could talk ... You ok. (Takes out phone).

Officer Eilber: And what's his name?

[] Garcia: Dominique Smith (Seems a bit calmer.)

Officer Eilber: What's his birthday?

[] Garcia: 11/08/94.

Officer Eilber: And you guys were living together?

[] Garcia: With his mother too. 2 Spring Lane East Stroudsburg Pa.

Officer [Eilber]: Is she there?

[] Garcia: No.

Officer Eilber: You feel like you can breathe at all?

[] Garcia: He like, he did it twice. The first time he grabbed me and lifted me, yeah, with two hands. (Calmer). (Stopped crying). And you could tell where he was he got my blood all over the carpet in the house.

Officer Eilber: He got you really good. Are you sure you don't want to get checked out? Just to make sure.

[] Garcia: I'll go. I'm sorry. My friend just has to go to work and I don't want to hold her up ... I'll go after she gets to work and afterwards. I just want to get the report out of the way like so I can wipe the blood off my face. And then after that I'll be back to talk to you or whatever but things need to be done.

That was the extent of the video footage offered by the Commonwealth, which lasted approximately three minutes and forty-six seconds. [Defense counsel] had objected to the introduction of the video evidence, but when it was admitted, he asked that more of the tape be presented, which the court allowed. [Officer] Eilber spoke with [] Garone about the incident. Garone stated that when she arrived to pick up Garcia, she saw Smith punch Garcia in the face again outside. Garone related that Smith was throwing all of Garcia's clothing and the baby's clothing out of the house onto the back porch, and that after Smith punched her, they got into Garone's vehicle and drove to the police station. [] Garcia asked the police to allow her to go with them to the residence so she could recover her belongings which Smith had thrown on the porch.

Officers Hettel and Eilber went to 2 Spring Lane. Garone drove Garcia back with them. The officers tried to contact Smith. No one answered. Garcia collected her clothing from the back porch. Smith's vehicle, a black 2017 Volkswagen Passat, was in the parking lot. [Officer] Eilber went back to the police station to obtain an arrest warrant. Detectives were stationed to provide surveillance on the house while Officer Eilber obtained the warrant for Smith. At approximately 8 p.m. [Officer] Eilber went back to the residence. The police believed that Smith was inside the house. [Officer] Eilber spoke on a loudspeaker requesting Smith to surrender. No one answered. Several people came out of the house. The first was identified as Smith's half-brother. Later, Mrs. Williams, his mother, came out. Then several females emerged. Two hours later, Smith surrendered. He came out with another female, identified as Amber Rodriguez. Smith was charged with aggravated assault, strangulation, simple assault and reckless endangerment.

Smith filed an omnibus pretrial motion in which he challenged the introduction of the 911 call and the bodycam footage. A habeas corpus hearing was held in which the court recognized the evidence of the 911 call and the bodycam video as admissible hearsay under the excited utterance exception to the hearsay rule. Shortly before trial, Smith filed a motion *in limine*, arguing that the use of the 911 call and the bodycam video violated Smith's Sixth Amendment rights under the Confrontation Clause. The court addressed the motion in limine and by order of January 15, 2025, the court denied the motion.

At trial, the prosecution called Nicholas Dennis from the Monroe County Control Center as its first witness. Dennis authenticated the 911 call as the recording that was made on the date of the incident. The 911 call was admitted under the hearsay exception of excited utterance. It was also determined that the 911 call was not testimonial.

The redacted bodycam footage up until 3:46 seconds was also admitted as nontestimonial admissible hearsay under excited utterance. [Smith] insisted that if the bodycam was to be admitted over objection, it should be admitted in its entirety up until 10:30 seconds. The Commonwealth maintained that it be played until 3:46 seconds and that the statements made by Garone be redacted because it was admitted as inadmissible hearsay. The court granted the defense request to play the longer video.

Officer Eilber took the witness stand. [Officer] Eilber was a patrol officer who had been with the police for nine and a half years. Around 12:30 p.m. on March 13, 2024, he received a 911 call for a domestic violence incident. He testified that when he met Garcia at the police station, she had a swollen left eye. There was blood coming from her nose. She had redness around her neck and throat. Photos were taken. The first four photos were the ones that [Officer] Eilber took of [] Garcia when they went to the residence at Spring Lane. Three other photos were sent by Garcia that afternoon. [Smith] did not object to the admission of the photos. [Officer] Eilber testified that when he first contacted Garcia, he noticed she was "extremely upset," "heavy crying," "loud," "verbal," "manic," and "excited." He described her as "coughing a lot, crying, nose was running." [Officer] Eilber testified that when he asked her what happened, the words just flowed.

[Officer] Eilber testified that after the conversation, he went to 2 Spring Lane. Garcia followed. [Officer] Eilber arrived. He saw various items strewn on the back porch. Garcia began collecting them. She put them in Garone's vehicle. [Officer] Eilber attempted to contact Smith. [Officer] Eilber knocked on the door. There was no answer. They tried front and back. They pounded on the door. There was no response. The officers left to obtain an arrest warrant. Other officers were placed to watch the residence. A female exited. They contacted her. She confirmed that Smith was in the basement. [Officer] Eilber returned to the residence with the arrest warrant. He haled Smith with a loud speaker from his

patrol car. Officers knocked on the door. Two hours later, Smith came out.

[Officer] Eilber testified that Garcia went to the hospital later that evening after she had arranged care for her child. The police obtained [] Garcia's medical records from her visit to the hospital. A sealed certified copy of the records was introduced in addition to an opened one. [Defense counsel] objected to the introduction of the medical records. He did not object to the certification of the records from the hospital; his objection was that [] Garcia did not testify that she went to the hospital[.] …

The objection to lack of [] Garcia's corroborating testimony about her hospital stay was overruled. …

The Commonwealth rested after Officer Eilber's testimony and the defense called no witnesses.

Trial Court Opinion, 6/10/25, at 1-7 (record citations omitted). The jury found Smith guilty of Count 3—simple assault, and Count 5—REAP, and not guilty of Count 1—aggravated assault and Count 2—strangulation. The court entered an order to that effect on the same day. *See* Order – Verdict, 1/16/25.

On January 21, 2025, the trial court entered an order amending the January 16, 2025, order to include that the trial court found Smith guilty of the summary offense of harassment, and that the charges for Count 4—simple assault and Count 7—terroristic threats had been dismissed on the Commonwealth's motion. *See* Order, 1/21/25.

On March 17, 2025, the trial court sentenced Smith to 12 to 24 months' incarceration, with credit for time served for simple assault, and a consecutive term of 6 to 12 months' incarceration for REAP. On March 19, 2025, the court entered an amended sentencing order, to note that no sentence would be

imposed for the summary harassment charge, because it merges with the simple assault charge.

On March 27, 2025, Smith filed a post-sentence motion seeking acquittal based on insufficient evidence, arguing that his convictions were based on the 911 call and BWC, which were inadmissible hearsay and violated his rights under the Confrontation Clause.[3] The trial court denied the motion. This timely appeal followed.

Smith raises the following issues on appeal:

1. Whether the trial court erred when it admitted the 911 call and [BWC] containing the statements of the complainant, who did not testify at trial, because the evidence violated the Confrontation Clause of the United States Constitution?

2. Whether the trial court erred when it admitted the 911 call and [BWC] containing the statements of the complainant, who did not testify at trial, because the evidence was hearsay not falling within any exception?

Appellant's Brief, at 6 (suggested answers omitted).

Both of Smith's issues challenge evidentiary rulings made by the trial court. Our standard of review for the admission of evidence is well-settled:

The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

_____

[3] U.S. Const. amend. VI; Pa. Const. Art. I § 9.

> To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. [A]n evidentiary error of the trial court will be deemed harmless on appeal where the appellate court is convinced, beyond a reasonable doubt, that the error could not have contributed to the verdict.

***Commonwealth v. Manivannan***, 186 A.3d 472, 479-80 (Pa. Super. 2018) (citations and quotation marks omitted).

In both issues, Smith argues the trial court erred when it admitted the 911 call and BWC, containing statements of the complainant, who did not testify at trial. Relevantly, during trial, the trial court overruled Smith's objections based on hearsay and a violation of his constitutional confrontation rights. Further, the court denied Smith's post-sentence motion based on the same arguments.

Hearsay is a statement that the declarant does not make while testifying at trial and is offered into evidence to prove the truth of the matter asserted. ***See*** Pa.R.E. 801(c). Hearsay is inadmissible unless an exception applies. ***See*** Pa.R.E. 802 ("Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute."). One exception is the excited utterance exception. ***See*** Pa.R.E. 803(2). An excited utterance is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Pa.R.E. 803(2).

The trial court thoroughly summarized the law surrounding the excited utterance exception as follows:

The Pennsylvania Supreme Court has described the excited utterance exception this way:

> As is well-settled, excited utterances fall under the common law concept of *res gestae*. *Res gestae* statements, such as excited utterances, present sense impressions, and expressions of present bodily conditions are normally excepted out of the hearsay rule, because the reliability of such statements are established by the statement being made contemporaneous with a provoking event. While the excited utterance exception has been codified as part of our rules of evidence since 1998, **see**, Pa.R.E. 803(2), the common law definition of an excited utterance remains applicable, and has been often cited by this Court:

> [A] spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person has just participated in or closely witnessed, and made in reference to some phase of that occurrence which [s]he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from h[er] reflective faculties … Thus, it must be shown first, that [the declarant] had witnessed an event sufficiently startling and so close in point of time as to render her reflective thought processes inoperable and, second, that her declarations were a spontaneous reaction to that startling event.
> []
> The circumstances surrounding the statements may be sufficient to establish the existence of a sufficiently startling event.

***Commonwealth v. Murray***, 83 A.3d 137, 157-58 (Pa. 2013) (internal citations omitted).

In determining whether a statement is an excited utterance, courts have considered the following:

> 1) whether the declarant, in fact, witnessed the startling event; 2) the time that elapsed between the startling event and the declaration; 3) whether the statement was in narrative form (inadmissible); and, 4) whether the declarant

spoke to others before making the statement, or had the opportunity to do so.

These considerations provide the guarantees of trustworthiness which permit the admission of a hearsay statement under the excited utterance exception. It is important to note that none of these factors, except the requirement that the declarant have witnessed the startling event, is in itself dispositive. Rather, the factors are to be considered in all the surrounding circumstances to determine whether a statement is an excited utterance.

**Commonwealth v. Keys**, 814 A.2d 1256, 1258 (Pa. Super. 2003) (internal citations and quotation marks omitted) (emphasis omitted).

Further, Pennsylvania courts "have not established a bright line rule regarding the amount of time that may elapse between the declarant's experience and her statement." **Commonwealth v. Gray**, 867 A.2d 560, 570 (Pa. Super. 2005), **appeal denied**, 879 A.2d 781 (Pa. 2005). "Rather, the crucial question, regardless of time lapse, is whether, at the time the statement is made, the nervous excitement continues to dominate while the reflective processes remain in abeyance." **Id.** at 570-71 (internal quotation marks omitted). As well, "a statement, which otherwise qualifies as an excited utterance, is not precluded from falling within the excited utterance exception to the hearsay rule when made in response to questioning." **Commonwealth v. Colon**, 102 A.3d 1033, 1039 (Pa. Super. 2014), **appeal denied**, 109 A.3d 678 (Pa. 2015). []

Trial Court Opinion, 6/10/25, at 8-10.

Here, Garcia's statements made during a 911 call and captured on BWC were hearsay. Smith claims no exception applies that would permit those statements being admitted at trial. The Commonwealth argues that the hearsay statements were properly permitted as excited utterances.

The trial court found the statements were excited utterances and were properly admitted as exceptions to the hearsay rule based on the following facts:

- Garcia called 911 seeking police assistance because her boyfriend had just beaten her and thrown her clothing out of the house;
- Garcia met with an officer at the SARP headquarters only 10 minutes later at the police's direction;
- As Garcia related that she got into a fight with her boyfriend (Smith) that morning, she was crying, bleeding from facial wounds, had a swollen face and obvious injuries near her eye;
- Garcia appeared upset and was crying and coughing from apparent distress in her windpipe as she explained what happened;
- Garcia repeatedly stated that Smith had thrown all her belongings out of the house and that all she had was her baby bag with the supplies for her young child;
- Garcia asked the officer for assistance to recover her belongings from the house; and
- Officer Eilber asked her a few questions, but did not take her into the station to interrogate her.

*See* Trial Court Opinion, 6/10/25, at 12. We agree with the trial court that the hearsay statements were admissible as excited utterances.

The statements were made by Garcia within the same morning that she was abused by Smith. Certainly, being punched and choked repeatedly by your partner is a "startling event." *See* Pa.R.E. 803(2). It is clear Garcia called 911 and spoke with the police, as captured on the BWC, not long after the abuse occurred because she was still trying to collect herself, and was choking and coughing in an attempt to catch her breath due to being choked. Garcia was "extremely upset," "heavy crying," "loud," "verbal," "manic," and "excited," as she spoke with police. *See* N.T., 1/16/25, at 36. Notably, Officer

- 11 -

Eilber explained that when he asked her what happened "it just all came out. She just kept going," indicating a frantic disposition. *Id.* at 37.

While Garcia did not immediately go to the hospital, it is evident she was still under the stress of being assaulted and needing to safely collect her possessions and wanted to make sure the ongoing situation was over before going to the hospital. *See* Pa.R.E. 803(2). The fact that statements were made in response to questioning, albeit informal questioning, with the police, does not change the fact that these statements were excited utterances. *See Colon*, 102 A.3d at 1039.

Accordingly, the court did not abuse its discretion in concluding the statements were excited utterances, and admitting them as exceptions to the rule against hearsay.

Smith further challenges the admission of the 911 call and BWC as having been presented in violation of the Confrontation Clause of the Sixth Amendment. The trial court also thoroughly summarized the law surrounding a constitutional challenge to the excited utterance exception as follows

> The Superior Court addressed such a challenge in [] *Gray*[]. There the Superior Court permitted the use of an excited utterance as an exception to the hearsay rule and found that the statement was not in violation of the Confrontation Clause. The police in *Gray* were called to a location to investigate a domestic dispute. They were approached by a girl who told them she had been assaulted and that her mother had been stabbed and that the perpetrator remained upstairs with her mother. The witness was crying and was flustered, in a state of nervous excitement. The Superior Court found that the trial court did not abuse its discretion when it admitted this testimony under the excited utterance exception to the hearsay rule. The court also found that

the evidence did not violate the Confrontation Clause. The ***Gray*** court stated:

> In ***Crawford v. Washington***, 541 U.S. 36[] (2004), the Supreme Court held that, when the prosecution seeks to introduce a "testimonial" out-of-court statement into evidence against a criminal defendant, the Confrontation Clause of the Sixth Amendment requires: (1) that the witness who made the statement is unavailable; and (2) that the defendant had a prior opportunity to cross-examine the witness.

[] ***Gray***, 867 A.2d [at] 572 [].

The Confrontation Clause only seeks to protect a defendant from testimonial out of-court statements. The United States Supreme Court did not define "testimonial," but offered the following guidance:

> Various formulations of this core class of "testimonial" statements exist: "ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" "extrajudicial statements … contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

***Gray, supra***, (citing ***Crawford***, 541 U.S. at 51- 52); [].

To further clarify the distinction between testimonial and nontestimonial statements, the Court in ***Davis v. Washington***, 547 U.S. 813 (2006), addressed two types of statements to police and held that whether a statement is testimonial depends on its "primary purpose:"

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.

> They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
>
> ***Commonwealth v. Yohe***, 79 A.3d 520,531 (Pa. 2013) (citing ***Davis***, 547 U.S. at 822) [].

Trial Court Opinion, 6/10/25, at 13-14.

Here, the trial court concluded that Garcia's statements should not be considered testimonial under ***Crawford*** because the statements were made while Garcia sought police assistance after she fled her residence and called 911, while she was still under stress from the event, was crying and had obvious facial wounds from being beaten, and was coughing from having been choked. ***See*** Trial Court Opinion, 6/10/25, at 14.

While it is understandable why Smith would raise this argument, we nevertheless do not find the trial court abused its discretion in its conclusions. The statements made on the 911 call and captured on the BWC were informal and made in response to informal questioning. Both Garcia's statements and Officer Eilber's questions were made in order to address an ongoing matter, and to assess what steps needed to be taken to ensure Garcia's safety and conclude the matter. Accordingly, the court did not err in concluding the statements were nontestimonial in nature, and therefore beyond the scope of the Confrontation Clause.

Based on the above, the trial court did not abuse its discretion in finding the statements were excited utterances and nontestimonial in nature. We

commend the trial court for providing us with a comprehensive and well written decision. Accordingly, the court did not err in permitting the Commonwealth to admit the 911 call and BWC. We therefore affirm the judgment of sentence.

Judgment of sentence affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 5/22/2026